In re STATE OF FLORIDA,
DEPARTMENT OF STATE,
Petitioner-Appellant,

v.

TREASURE SALVORS, INC., a corporation, and Armada Research Corp., a corporation, Plaintiffs-Appellees,

The Unidentified Wrecked and
Abandoned Sailing Vessel,
etc., Defendant.

No. 78–2950.

United States Court of Appeals,
Fifth Circuit.

July 24, 1980.

Bernard S. McLendon, Sp. Asst. Atty. Gen. of Fla., Jacksonville, Fla., for petitioner-appellant.

David P. Horan, Key West, Fla., for plaintiffs-appellees.

Before GEWIN, RUBIN and SAM D. JOHNSON, Circuit Judges.

SAM D. JOHNSON, Circuit Judge:

This appeal offers this Court its second opportunity to determine ownership rights in artifacts recovered from the Spanish vessel, *Atocha*. In this Court's first opinion, *Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel*, 569 F.2d 330 (5th Cir. 1978) (hereinafter *Treasure Salvors I*), it was held that Treasure Salvors and Armada Research Corp.[1] had title to the vessel and its cargo as against the United States. In the instant case this Court affirms the district court's holding that these two Florida corporations have title to various artifacts as against the State of Florida.[2]

*Facts*

The historical backdrop for this case was detailed in *Treasure Salvors I*, 569 F.2d at 333, and was the subject of a National Geographic article, Lyon, *The Trouble with Treasure*, 149 National Geographic 787 (June 1976), but is well worth repeating. This case dates back to the early 17th Cen-

---

1. These two corporations will be referred to as Treasure Salvors in this opinion.

2. In November 1975, plaintiffs issued and published a monition against all potential claimants of the vessel and its cargo, admonishing them to file their claims to the vessel. Only two parties did so—the United States and Flor-

ida. On April 4, 1978, this Court issued a mandate affirming the district court's judgment in *Treasure Salvors I*, as modified, against the United States. On May 3, 1978, the district court issued a default judgment against all potential claimants who had not filed their claims and barred and precluded filing any further claims to the vessel.

tury, when Spain was using the riches of the New World to finance her European military adventures. On September 4, 1622, a fleet of 28 ships, known as the Tierra Firme Flota, commanded by the Marquis of Cadereita, set sail from Havana for Cadiz laden with bullion, spices, and tobacco for King Phillip IV. As the ships entered the Florida Straits in search of the favorable Gulf Stream currents, bad weather set in, and the vessels soon found themselves in the midst of a hurricane. The destructive winds from the northeast stripped the vessels of their masts, sails, and standing rigging. The winds then shifted to the south and eight of the ships were driven toward the dangerous waters of the lower Florida Keys, where they were soon lost. The remaining vessels limped back to Havana. One of the eight ships that went down was the *Nuestra Senora de Atocha*. When the *Atocha* set sail from Havana, she was carrying in excess of one million pesos of registered bullion and specie. Her hold contained a treasure worthy of Midas: 160 gold bullion pieces, 900 silver ingots over 250,000 silver coins, 600 copper planks, 350 chests of indigo and 25 tons of tobacco.[3]

The Spaniards began a salvage effort as soon as the news of the disaster reached Havana. Under the direction of Captain Gasper de Vargas, the salvors located the *Atocha* intact in 55 feet of water, with her mast peering above the surface. The divers, however, were unable to enter the holds containing the treasure, as they were all battened down. Only two bronze cannons from the upper deck of the stern castle could be retrieved.

De Vargas opted to place surface buoys to mark the position of the *Atocha* and sail west to salvage the *Rosario*, another of the eight vessels that sank in the hurricane. In early October, another hurricane ravaged the Lower Keys, breaking up the hull of the *Atocha* and spreading her treasure beneath the sands. When Vargas returned, he found the storm had removed the protruding mast and his surface buoys. He was unable to relocate the vessel.

Early in 1623, the Marquis of Cadereita sailed from Havana to personally supervise the search.[4] The continued efforts proved fruitless. Finally, in late 1623, the Spaniards abandoned the search.

The Cuban authorities, however, did not give up hope. They continued to keep the general area buoyed in anticipation of future salvage efforts.[5] In 1626, Francisco Nunez Melian began searching for the *Atocha* and *Santa Margarita* under a Royal salvage contract. Using state of the art equipment, including a 600 pound bronze diving bell with windows, Melian was able to find the *Santa Margarita* and, over four years, salvage her cargo. Dutch raiding parties, hostile Indians,[6] and political opportunities[7] eventually brought the search for the *Atocha* to a close in 1641. Finally, in 1683, the Spanish House of Trade published a list of ships still missing. The *Atocha* headed the list. Melian's salvage accounts were sent from Havana to the Archive of the Indies in Seville, and the *Atocha* passed into history.

Over three centuries later, in the mid-1960's, treasure searchers renewed their ef-

3.  In 1978, this cargo was valued at $250 million. Today's meteoric rise in the price of precious metals has undoubtedly substantially increased the present value of the Spaniards' booty.

4.  The Marquis directed the salvage operation from his camp on one of the nearby keys. These keys were named "Cayos de Marques" after the Marquis and today are known as the Marquesas Keys.

5.  In 1625 another vessel was lost and all the crew members perished in this continuing ef-

fort to mark the location of the treasure-laden vessels.

6.  The Indians burned a salvage vessel that floundered just off the Marquesas Keys and, eventually, the Spanish salvage camp.

7.  Melian was appointed Governor at Caracas. Captain Juan de Anvez continued the salvage of the *Santa Margarita*, but only occasionally searched for the *Atocha*.

forts to locate the *Atocha* and her rich treasure. By 1968, the search was concentrated in the Middle Keys, near Upper Matecumbe Key. This area was isolated by the searches after pouring through the Spanish archival records in Seville.[8] Years of searching yielded nothing.

Finally, in the late 1960's, Dr. Eugene Lyon, working as a consulting historian for Treasure Salvors, uncovered documentary evidence which indicated to him that the current salvage efforts were directed at the wrong set of keys. He discovered that "Matecumbe" was a general term used to denote the Florida Keys as a whole. A thorough search of Melian's salvage records revealed that the search for the *Atocha* had been centered near "Cayos del Marques." This placed the wreck of the *Atocha* somewhere between the Dry Tortugas and Sand Key in the Lower Keys.

Once Dr. Lyon ascertained what he believed to be the correct general area of the *Atocha's* watery grave, "all" that remained for Treasure Salvors was to pinpoint the exact location. It was a task easier said than done. For one year they searched some 120,000 nautical miles of seabed 24 hours a day before detecting a large galleon-size anchor in the spring of 1971. Additional shipwreck material was recovered in the immediate vicinity of the anchor. Soon the wreck was identified as part of the break-up of the *Atocha*.[9]

In April 1971, Treasure Salvors and the State of Florida executed a one year contract allowing Salvors to conduct their underwater salvage operations on the *Atocha*. Both parties entered into this agreement under the belief that the *Atocha* was resting on land owned by Florida. Eventually, four contracts were signed (the last in November 1974) each running about one year. Under the contracts, the State was entitled to 25% of the finds. In June 1973, Florida's Division of Archives in Tallahassee received its share [10] of the first batch of artifacts recovered by Treasure Salvors. In February 1975, the Salvors delivered what turned out to be the State's last batch.

The *Atocha's* legal odyssey began with the Supreme Court's decision in *United States v. Florida*, 420 U.S. 531, 95 S.Ct. 1162, 43 L.Ed.2d 375 (1975). The Court affirmed the report of Special Master Maris, rejecting Florida's ownership claim of submerged lands, including that part of the continental shelf on which the *Atocha* rests. The report established that Florida had *never* owned an interest in any of the lands involved in the case at bar. On July 18, 1975, four months after the Supreme Court's holding, Treasure Salvors filed an in rem action in the Southern District of Florida for possession or confirmation of title to the abandoned vessel believed to be the *Nuestra Senora de Atocha*.

The United States intervened in the action and asserted title to the vessel. The district court entered judgment for Treasure Salvors and this court affirmed the trial judge's ruling that as between Treasure Salvors and the United States, Treasure Salvors had title to and right to possession of the vessel and its cargo. *Treasure Salvors I.*

The State of Florida initially refrained from intervening in the action. Instead,

---

8. Documents drafted at the same time as the *Atocha* went down indicated that the vessel sank near "Matecumbe." Searchers concentrated their efforts in the Middle Keys, hoping that the "Matecumbe" referred to in the original documents corresponded to the modern key bearing that name.

9. The wreck site is located near some shoals known as the "Quicksands," nine and one half nautical miles west of the Marquesas Keys and forty nautical miles west of Key West. Those mariners familiar with this area will recognize

it as being in the heart of a Naval Operational Training Area and only three nautical miles west of a Bombing and Strafing Target Area.

10. Treasure Salvors kept many of the artifacts recovered at their corporate headquarters, a 168 foot reconstructed galleon anchored at the foot of Margaret Street in Key West, Florida. The precious stones were kept in a safety deposit box in Key West.

the State prepared for the eventuality of a judgment in favor of the federal government. Florida assisted the United States in the lawsuit [11] and entered into preliminary negotiations regarding the disposition of the *Atocha's* treasure should the federal government prevail.[12] The adverse judgment left Florida in the cold.

In April 1978, after this Court's judgment for Treasure Salvors, the district court issued a warrant for arrest in rem. The warrant directed the marshal to take possession of all artifacts from the vessel in the custody or control of the State's Division of Archives' office in Tallahassee.[13] Florida filed a motion to quash the arrest warrant and successfully sought an emergency stay of the district court's order from this Court. In Re: *State of Florida, Department of State*, No. 78–1763 (5th Cir. April 12, 1978). In accordance with this Court's order, on April 14, the district court stayed the execution of the arrest warrant.

This temporary ban on the execution of the warrant for arrest did not halt the legal maneuvers. The district court denied Florida's motion to quash the warrant and granted Treasure Salvors' motion of April 17 to require the State of Florida to show cause [14] why it should not be ordered to transfer the artifacts in its possession to the custodians appointed by the district court.[15] The State answered, asserting that the court lacked jurisdiction and that Florida owned the artifacts in the possession of the Tallahassee office of the Division of Archives. On July 27 and 28 the district judge held a full evidentiary hearing on the jurisdictional issues and the merits of the order to show cause.[16]

After the hearing, the district judge filed a Memorandum Order containing extensive findings of fact and conclusions of law. 459 F.Supp. 507. The judge found that the order to show cause was properly issued. The court then held that the State of Florida was bound by the earlier judgment in *Treasure Salvors I*. Alternatively, the trial judge held that the suit to determine title to the artifacts was not barred by the eleventh amendment and that Florida's claim of ownership was without merit. The trial judge directed the State to deliver the artifacts to the district court. The State of Florida then instituted this appeal. This Court is persuaded that the district court's alternative holding is correct, and we affirm.[17]

*Eleventh Amendment*

■ Florida's initial jurisdictional contention is that the order to show cause directed at the Division of Archives is

11. An attorney for the Florida Secretary of State, the agency that administers the Division of Archives, worked with the federal government on the case and monitored, for Florida, the progress of the litigation.

12. The Division of Archives was negotiating with the Department of the Interior during the course of the litigation for an antiquities permit. Apparently, if the United States had been successful, the Division would have received an antiquities permit for the wreck site.

13. Tallahassee is located in the Northern District of Florida. The marshal was instructed to bring the remnants of the vessel and her cargo into the custody of the district court in the Southern District.

14. This order to show cause is known as ancillary process. Supplemental Admiralty Rule C(5).

15. The district judge had previously appointed Treasure Salvors substitute custodians. *Treasure Salvors, Inc. v. The Unidentified Wrecked and Abandoned Sailing Vessel*, No. 75–1416 (S.D.Fla., Oct. 28, 1975).

16. In order to expedite the litigation, Treasure Salvors agreed to allow the Division of Archives to serve as temporary custodian of the disputed artifacts.

17. This Court declines to either affirm or reverse the trial judge's innovative res judicata analysis. The preclusion issues raised by the district court's opinion are reserved for another day.

barred by the eleventh amendment.[18] The State asserts that it owns the artifacts in dispute and thus the district court's attempt to adjudicate ownership is, in essence, a suit against a state. Florida argues that since it has not waived its eleventh amendment protection by voluntary assertion of a claim or defense, see *Gardner v. New Jersey*, 329 U.S. 565, 67 S.Ct. 467, 91 L.Ed. 504 (1947), the district court lacked jurisdiction.

The Supreme Court has held that the eleventh amendment applies to admiralty in rem actions. *In re State of New York*, 256 U.S. 490, 41 S.Ct. 588, 65 L.Ed. 1057 (1921). In a companion case, *In re State of New York*, 256 U.S. 503, 41 S.Ct. 592, 65 L.Ed. 1063 (1921), the Court provided guidance for evaluating eleventh amendment claims in admiralty in rem actions.

In that case the administrators of Evelyn McGahan's estate filed a libel in admiralty against a tug, the *Queen City*, alleging that the negligent operation of the tug caused McGahan's death. The State of New York entered a special appearance and filed a verified affidavit suggesting that the district court lacked jurisdiction because the vessel was the State's property, and had been in its possession and control at the time of the accident. The libelants offered *nothing* to controvert the State's affidavits. The district court rejected New York's claim of immunity and the Supreme Court reversed.

The Court first focused on the district judge's refusal to accept the State's assertion of ownership. "We deem it clear . . that the verified suggestion presented by the Attorney General of that state . . ought to be accepted as sufficient evidence of the fact [of ownership], *at least in the absence of a special challenge.*" *Id.* at 509 (emphasis added). The Court held that the district judge, given the uncontroverted claim to the vessel, should have acknowledged the State's ownership. It went on to conclude that admiralty in rem process cannot be issued on public property of a state "used and employed for public and governmental purposes." *Id.* at 511.

The *Queen City* tells us that when a state submits uncontroverted evidence of ownership in an admiralty in rem action, the district court is bound to accept the assertion and apply the eleventh amendment accordingly. In the case at bar, however, we have a *controverted* claim of ownership. Treasure Salvors offered evidence and legal arguments to show that it, and not Florida, owned the artifacts from the *Atocha*. Such an offer is the "special challenge" that the Supreme Court envisioned in the *Queen City*. This challenge operates to rebut the presumption of validity attributed to a state's ownership claim.

Once an appropriate challenge is made, a district judge is no longer compelled to conclude that the state owns the res in dispute. Instead, the Court must make a jurisdictional determination very similar to that made in the classic "jurisdiction to determine jurisdiction" line of cases. In that genre, the pivotal jurisdictional question involves essentially the same analysis as is posed by the merits of the case. *See United States v. United Mine Workers*, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed.2d 884 (1957). Where "the issue of jurisdiction is inextricably intertwined with the merits of the controversy," the court retains the case and resolves the issue, since federal courts "always have jurisdiction to determine our jur-

---

**18.** U.S.Const. amend. XI provides:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

Although the eleventh amendment is not literally applicable to suits against a state by her own citizens, the Supreme Court has construed the amendment to cover such actions. *Edelman v. Jordan*, 415 U.S. 651, 662, 663, 677 n. 19, 94 S.Ct. 1347, 1355, 1362 n. 19, 39 L.Ed.2d 662 (1974).

isdiction." *Nestor v. Hershey*, 425 F.2d 504, 511 (D.C.Cir.1969).[19]

In the case at bar, ownership of the salvaged items is determinative of both the eleventh amendment and the merits. Since we agree with the trial court's assessment that Florida lacks an ownership interest in the artifacts, *see* pp. 1348–1349 *infra*, we affirm the judge's holding that the order to show cause is not, in this case, a suit against a state.[20]

*Jurisdiction and Process*

■ Given the lack of eleventh amendment and sovereign immunity problems, it must be determined whether the district court had the power to issue the "show cause order" and adjudicate the merits of the ownership claims. A careful analysis of the record establishes that admiralty jurisdiction provided the district court a firm foundation for its actions.

■ Admiralty in rem jurisdiction generally requires that the res be present *in the district* when the suit is filed or during the pendency of the action.[21] *Platoro Ltd., Inc. v. Unidentified Remains of a Vessel*, 508 F.2d 1113, 1115 (5th Cir. 1975). The fact that a res was at one time within the district is insufficient to establish *in rem* jurisdiction. *Id.* at 1116. The crux of the

State's argument is that the artifacts in dispute were not present in the Southern District of Florida when this litigation began back in 1975 and never were present in the Southern District at any time during the litigation. Given the general requirement of presence, the absence of the items in dispute, the State argues, deprive the district court of in rem jurisdiction and thus the power to issue the order to show cause and adjudicate the ownership interest in the particular artifacts held in Tallahassee.

The State misconceives the nature of the district court's exercise of jurisdiction. It is undisputed that most of the artifacts *recovered* from the *Atocha* were present in the Southern District of Florida when the litigation began.[22] The district court clearly had the power to adjudicate the ownership of the artifacts located in its district. The issue before this Court is whether the presence of the artifacts in the Southern District provided a sufficient foundation for the trial judge's order to show cause aimed at artifacts being held by the State in the Northern District of Florida. It is this Court's conclusion that the trial court was authorized to issue ancillary process in this case by Supplemental Admiralty Rule C(5).

Rule C(5)[23] provides that where in rem process has already been served and where

---

**19.** This approach is especially desirable in admiralty in rem actions. Federal courts have exclusive jurisdiction over admiralty in rem proceedings. *Madruga v. Superior Court of California*, 346 U.S. 556, 74 S.Ct. 298, 98 L.Ed. 290 (1954), G. Gilmore and C. Black, The Law of Admiralty § 1–13 (2d ed. 1975). If the mere assertion of ownership by a state of a res was sufficient to invoke the eleventh amendment, petitioners such as Treasure Salvors would find themselves stranded without a forum in which to litigate their claim.

**20.** Our holding that this action does not involve a suit against a state also disposes of Florida's claim that it has not waived sovereign immunity.

**21.** In *Treasure Salvors I* this Court held that a party may waive the requirement that a res be present within the district and consent to a court's admiralty in rem jurisdiction. 569 F.2d at 335. Florida, however, has not consented to waive the usual jurisdictional requirements.

**22.** Under the salvage contract between Treasure Salvors and Florida, Florida received 25% of the finds. Treasure Salvors kept its share of the artifacts recovered either at its headquarters in Key West or in a bank in Key West. *See* note 9 *supra.*

**23.** Supplemental Admiralty Rule C(5):

(5) **Ancillary Process.** In any action in rem in which process has been served as provided by this rule, if any part of the property that is the subject of the action has not been brought within the control of the court because it has been removed or sold, or because it is intangible property in the hands of a person who has not been served with process, the court may, on motion, order any person having possession or control of such property or its proceeds to show cause why it should not be delivered into the custody of the marshal or paid into court to abide the judgment; and, after hearing, the court may

part of the property that is the subject of the action is not within the control of the court "because it has been removed or sold," the court may order the party in possession to show cause why the property should not be delivered to the custody of the marshal. Rule C(5) goes on to state that after the show cause hearing, "the court may enter such judgment as law and justice may require."

There is no doubt that in rem process was served with respect to the salvaged articles from the *Atocha*, and some of the artifacts were not within the Southern District because they had been removed to the Northern District pursuant to the contract between Florida and Treasure Salvors. In this case, these facts alone do not justify the show cause order directed at the Division of Archives. It must also appear that: (1) the district court had control over a sufficient amount of the res to justify ancillary process and (2) ancillary process can be issued outside the district.

■ The rulemakers only contemplated the use of ancillary process where *the major portion of the res* is within the control of the court. *See* Notes of Advisory Committee on Rules, 28 U.S.C.A. Supplemental Rule C (1970); 7A Moore's Federal Practice ¶ C.15 at 700.4, 700.5 (2d ed. 1979); The George Prescott, 10 Fed.Cas. 222 (E.D.N.Y. 1865) (holding that under Admiralty Rule 9 ancillary process can reach property appurtenant to the arrested res, even though the property was removed from the res prior to seizure). The draftsmen did not intend to allow the presence of a portion of a res to support the issuance of ancillary process when the majority of the res is located outside the district. 7A Moore's *supra* at 700.4. Given the general requirement of

presence of the res to support in rem jurisdiction, a rule allowing a small part of the res to support issuing ancillary process against the major portion of the res would be to allow the proverbial tail to wag the dog. Jurisdiction over the extra-territorial portion of the res in such a situation can only be obtained by original process. *Id.*

For the purposes of ancillary process, it is apparent that the district court in the case at bar had "control" over a sufficient portion of the res to warrant the use of ancillary process. In making the sufficiency determination, the district court properly was entitled to consider the main body of the *Atocha* (that part still resting on the continental shelf) as being within its "control." The bulk of the *Atocha* lay buried in international waters forty nautical miles off the Florida coast, *not in another district.* The district court did everything possible to bring the vessel within its control.[24] Indeed, as a practical matter, it was impossible to bring the remainder of the vessel within any court's territorial jurisdiction on reasonable notice. Finally, there was little danger that significant portions of the res could escape an in rem decree. *Treasure Salvors I,* 569 F.2d at 335. In light of the *realities* of the situation, the district court's assessment that it had control over a sufficient portion of the *Atocha* was correct and this was a proper case for ancillary process. *Cf. Id.* at 334 (Admiralty in rem jurisdiction is a legal fiction designed to aid courts in "finding the most practical and efficacious means of resolving the disputes before them").

■ Even given that this was a proper case for ancillary process, it must still be ascertained whether ancillary process may be issued *outside the district but within*

---

enter such judgment as law and justice may require.

24. The court ordered the marshal to arrest the vessel and bring it within the court's physical control. Alternatively, the court appointed Treasure Salvors as custodian of the vessel "for possession and safekeeping . . . until further order of this court." On the facts of this case, this virtually placed the vessel *in custodia legis. Treasure Salvors I,* 569 F.2d at 335, n. 5.

*state boundaries.*[25] This determination hinges on the applicability of Supplemental Admiralty Rule E(3)(a).

Rule E(3)(a) provides:

(3) **Process.**

*(a) Territorial Limits of Effective Service.* Process in rem and of maritime attachment and garnishment shall be served only within the district.

(emphasis added). In the Advisory Notes the draftsmen, in commenting on Rule E(3)(a), stated that *"process requiring seizure of property* should continue to be served *only within the geographical limits of the district."* Notes of Advisory Committee on Rules, 28 U.S.C.A. Supplemental Rule E (1970) (emphasis added). Ancillary process, however, does not require the seizure of property. Rule C(5). The rulemakers appear not to have intended for Rule E(3)(a) to govern ancillary process.

There are two policy reasons that also support the conclusion that Rule E(3)(a) does not govern ancillary process. First, as the district judge noted, limiting ancillary process to the district would produce a multiplicity of lawsuits. 459 F.Supp. at 519. New lawsuits would have to be filed in each district to which a portion of the res had been removed. Such a procedure could hardly be classified as a valuable expenditure of judicial resources. Second, "to the extent a decree in rem may be said to affect all the normal incidents of the arrest-ed res, it may be necessary to give extra-territorial effect to ancillary process to enable the court to bring within its control all property its decree will affect." 7A Moore's, *supra* at 700.10. The Advisory Committee Notes and policy rationales compel the conclusion that Rule E(3)(a) was not designed to govern ancillary process.

Supplemental Admiralty Rule A provides that the general Rules of Civil Procedure govern actions in rem in the absence of a contrary Supplemental Rule.[26] Federal Rule 4(f) is the general rule concerning the territorial limits of process.[27] In accordance with Supplemental Rule A, Federal Rule 4(f) controls the limits of effective service in the case at bar. Rule 4(f) states that all process, other than subpoenas, may be served anywhere within the boundaries of the state in which the district court is located. Ancillary process here was served on the Division of Archive's office, located in the northern part of the state. Rule 4(f) was satisfied.

In sum, the trial judge had jurisdiction to issue ancillary process, and the process was effectuated within the state in accordance with Federal Rule 4(f). The trial court properly reached the merits of the dispute.

*The Merits*

■ Finally, this Court's attention is directed to Florida's contention that the district court erred in holding that the State had no interest in the artifacts from the

---

**25.** We pass no judgment, one way or another, on whether ancillary process may be effectuated across state lines.

**26.** Supplemental Admiralty Rule A, in pertinent part, states:

The general Rules of Civil Procedure for the United States District Courts are also applicable to the foregoing proceedings except to the extent that they are inconsistent with these Supplemental Rules.

**27.** Federal Rule of Civil Procedure 4(f) provides:

(f) **Territorial Limits of Effective Service.** All process other than a subpoena may be served anywhere within the territorial limits of the state in which the district court is held, and, when authorized by a statute of the United States or by these rules, beyond the territorial limits of that state. In addition, persons who are brought in as parties pursuant to Rule 14, or as additional parties to a pending action or a counterclaim or cross-claim therein pursuant to Rule 19, may be served in the manner stated in paragraphs (1)–(6) of subdivision (d) of this rule at all places outside the state but within the United States that are not more than 100 miles from the place in which the action is commenced, or to which it is assigned or transferred for trial; and persons required to respond to an order of commitment for civil contempt may be served at the same places. A subpoena may be served within the territorial limits provided in Rule 45.

*Atocha* and ordering the transfer of the items to the marshal for delivery to Treasure Salvors. A careful review of the record and the basic legal principles of contract law compel the conclusion that the trial court's order should be affirmed.

The facts underlying the merits of this case are quite simple. Beginning in 1971, Treasure Salvors and the State of Florida entered into a series of annual contracts governing the salvage of the *Atocha.* Both parties entered into these agreements under the impression that the seabed on which the *Atocha* lay was state land. Treasure Salvors agreed to relinquish 25% of the items recovered in return for the right to salvage on state lands. In 1975 the Supreme Court, in *United States v. Florida,* 420 U.S. 531, 95 S.Ct. 1162, 43 L.Ed.2d 375 (1975), held that the part of the continental shelf on which the *Atocha* was resting had never been owned by Florida. It was at this point that Treasure Salvors sought to be declared owner of the *Atocha.*

Even the briefest of glances at these facts cannot help but invoke thoughts of the doctrine of mutual mistake [28] and call to mind the seminal case of *Sherwood v. Walker,* 66 Mich. 568, 33 N.W. 919 (1887). *Sherwood* involved the classic remedy, "replevin for a cow." Plaintiff had agreed to purchase Rose 2d of Aberlone from defendants for $80. When the plaintiff tendered the money, the sellers refused to accept it and declined to yield Rose. At trial the sellers introduced evidence establishing that at the time of the agreement both parties thought Rose was barren and could not breed. Only in the interim, between the agreement to sell and the buyer's tender of the funds, was it discovered that Rose was with calf.[29] This mistake, sellers argued, went to the root of the parties' agreement. The Michigan Supreme Court agreed and allowed the sellers to avoid their contractual obligation.

The case at bar presents another example of mutual mistake. The parties entered into the salvage contracts under the mistaken assumption that the State of Florida owned the land. But for this belief, the Division of Archives and Treasure Salvors would not have executed the agreements. The trial court correctly held that the parties made a mutual mistake.

The facts of this case also raise the common law doctrine of failure of consideration.[30] Courts have long been reluctant to delve into the adequacy of consideration. *See e. g., Sir Anthony Sturlyn v. Albany,* 1 Cro.Eliz. 67 (Q.B. 1587); *Westlake v. Adams,* 5 C.V. (N.S.) 248, 265 (C.P. 1888) ("It is an elementary principle, that the law will not enter into an inquiry as to the adequacy of consideration . . . ."). A different approach, however, has been taken where there is a failure of consideration.

> The law aptly terms an agreement to do an act or to pay money or other thing where there is no consideration for it a *nudum pactum* —a *naked* agreement—a promise without legal support, which the law will not enforce, no matter whether verbal or written, or however earnestly and solemnly made.

*Jones v. McCallum,* 21 Fla. 392, 393, 395 (1885).

In the case at bar we have a failure of consideration. In return for 25% of the finds, the State of Florida offered Treasure Salvors the "right" to conduct a salvage operation on lands in which the state had no interest. There was a promise without legal support.

■ Where there is a failure of consideration, the injured party is free, upon dis-

---

**28.** In determining the existence of mutual mistake, there are no principles peculiar to admiralty. *Sicula Oceanica S.A. v. Wilmar Marine Engineering & Sales Corp.,* 413 F.2d 1332 (5th Cir. 1969).

**29.** Rose, with calf, was worth approximately seven times as much as a barren Rose.

**30.** Like mutual mistake, there are no principles of failure of consideration peculiar to admiralty. *See* p. 1349, n. 28, *supra.*

covery, to rescind the agreement and recover back what he has paid. *See United States v. Haynes School Dist. No. 8*, 102 F.Supp. 843 (E.D.Ark.1951). Treasure Salvors sought to rescind the contracts and recover back all the artifacts as soon as *United States v. Florida* was handed down. The district judge was acting well within his authority when he ordered the Division of Archives to deliver the artifacts in its possession to the marshal so that the salvaged items might be transferred to Treasure Salvors.

The State argues that the contracts between the parties should be declared valid because, at the time they were executed, the Florida Constitution stated that Florida owned the submerged lands holding the *Atocha*. In *United States v. Florida*, however, the Supreme Court held that this ownership claim was without merit and that the lands never belonged to Florida. A holding that the State's incorrect claim of ownership is sufficient to support the contracts would operate to overturn the doctrines of mutual mistake and failure of consideration. The invitation to do so must be declined.[31]

*Conclusion*

The district court had jurisdiction pursuant to Supplemental Admiralty Rules (C)(5) and (A) to issue the "show cause order" and adjudicate the merits of the State's ownership claim. Neither the eleventh amendment nor sovereign immunity prohibited such action. This Court's review of the record reveals that the trial judge's conclusion that the State did not have an ownership interest in the artifacts is correct. The judgment of the district court is

AFFIRMED.

ALVIN B. RUBIN, Circuit Judge, dissenting:

Respectfully, I dissent from the conclusion reached by my brethren that the dis-

trict court had jurisdiction. Because the State of Florida contended that it had title to the property within the jurisdiction of the court, the eleventh amendment deprived the district court of jurisdiction to adjudicate the State's title or lack of it. Moreover, if the district court was not barred from asserting jurisdiction by the eleventh amendment, it lacked in rem jurisdiction over the wreck.

The Eleventh Amendment is sweeping:

"The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State . . . ."

While the amendment in terms applies only to suits by citizens of another state, it also precludes jurisdiction over a suit by the citizens of a state against that state. *Hans v. Louisiana*, 134 U.S. 1, 3, 10 S.Ct. 504, 505, 33 L.Ed. 842 (1890).

Although, in briefs, the State of Florida does assert that it owns the artifacts in dispute, it has not waived its eleventh amendment immunity. It correctly asserts that the plaintiffs cannot bring it into a federal court to test its title to the artifacts.

Neither of the cases known as *In re New York*, 256 U.S. 490, 41 S.Ct. 588, 65 L.Ed. 1057 (1921) and 256 U.S. 503, 41 S.Ct. 592, 65 L.Ed. 1063 (1921), holds that a state can be brought involuntarily into an admiralty court for an adjudication of its property rights. In those cases, a tug had been libelled in a federal court. The state asserted an uncontroverted claim to ownership of the tug and intervened. The Supreme Court held the admiralty court could not issue in rem process against public property of the state. While it said, in reaching this conclusion, that the state's suggestion of ownership ought to be accepted in the absence of a special challenge, I do not understand this to imply that, if there is a *controverted* claim of state ownership, the contro-

---

**31.** There is some philosophical support for the position advocated by the State. *See* R. Descartes, Discourse on Method (1637) ("*Cogito, ergo sum*"—"I think, therefore I am.")

versy becomes an appropriate subject for admiralty jurisdiction. Such a conclusion is particularly difficult to reconcile with the eleventh amendment when, as here, the determination of ownership involves the adjudication of an underlying contract dispute between a citizen of the state and the state itself, a purely local question.

The doctrine that a court has jurisdiction to determine its own jurisdiction does not permit it to decide the merits of a suit against the state. Once the state appears and asserts title to the property in dispute the court's jurisdiction is ended. In essence, the suggestion by my brethren that the court can determine whether it has jurisdiction of a suit over state-claimed property by looking to the merits is equivalent to asserting that suits against a state are permitted by the eleventh amendment if the result is that the state loses.

The decision in *Tindal v. Wesley*, 167 U.S. 204, 17 S.Ct. 770, 42 L.Ed. 137 (1897) is not apposite here because the judgment in that dispute did not determine the rights of the state. In deciding that a claimant to property might sue persons preventing him from obtaining possession even though the possessors held the property on behalf of the state, the court reasoned that this was not an action against the state within the meaning of the Constitution because judgment would not conclude the state. *Id.* at 221, 17 S.Ct. at 777. Here the district court did precisely what was implicitly forbidden by *Tindal*: it concluded the state from claiming ownership of the property.

It is, I think, arguable that under *Tindal* the writ of arrest of the salvaged articles was proper because it was directed to certain named individuals and simply brought the articles into possession of the court. However, when the court went on to adjudicate the ownership of these articles, it determined a claim against the state. It decreed that Treasure Salvors and Armada Research Corporation have full title to the salvaged articles and that the contract under which the state had possessed some of the salvaged treasure was invalid. It seems to me that this is the precise result barred by the eleventh amendment.

Our decision on the first appeal is not res judicata of this claim. We there expressly modified the district court's order adjudicating title to Treasure Salvors as against all other possible claimants and limited the effect of the decree saying,

> . . . the district court properly adjudicated title to all those objects within its territorial jurisdiction and to those objects without its territory *as between plaintiffs and the United States.* In affirming the district court, we do not approve that portion of its order which may be construed as a holding that plaintiffs have exclusive title to, and the right to immediate and sole possession of, the vessel and cargo as to other claimants, if any there be, who are not parties or privies to this litigation. (Emphasis supplied.)

569 F.2d at 335–36.

The district court found that the State of Florida was bound by the decree on the basis that it was privy to the litigation because it had stood by, let the United States litigate and failed to intervene. These actions are not, in my opinion, sufficient to make the State of Florida either a party to this litigation or privy to it. The United States asserted a counterclaim; Florida did not. If the United States had succeeded, it would have been decreed owner of the property; Florida could not have been. Florida was doubtless interested in the success of the United States, and hoped to benefit if the federal government were decreed to be owner. This bystander's interest in the success of one litigant over another is not equivalent to consent to a decree adjudicating the bystander's title rights. Therefore, I cannot find that Florida's rights are determined by the district court's prior judgment, as modified by us.

In addition to lacking jurisdiction to adjudicate Florida's claim, the district court also was without in rem jurisdiction over a wreck that lay beyond the contiguous

waters. *See United States v. Williams*, 617 F.2d 1063, 1073 (5th Cir. 1980) (en banc) for a definition of the extent of these waters. The court did everything it could to obtain jurisdiction, but the fact remains that the wreck was not within its territorial domain or, so far as the record shows, within the jurisdiction of any other sovereign. There are indeed *res* that lie beyond the jurisdiction of any court to determine in rem ownership. The waters of the ocean are wide and deep. Many objects may sail on the ocean, float in it or lie at the bottom outside the in rem jurisdiction of any court.

This does not mean that disputes must go unadjudicated. The Florida state courts have in personam jurisdiction and there is no reason why ownership rights and contract issues cannot properly be adjudicated in that forum.

I would, therefore, dismiss this suit for lack of jurisdiction.