640 F.2d 560
 TREASURE SALVORS, INC., a corporation and Armada Research
Corp., a corporation, Plaintiffs-Appellees,
v.
The UNIDENTIFIED WRECKED AND ABANDONED SAILING VESSEL, etc., Defendant,
Olin Frick, John Gasque, William Riley and The Masters of
the Motor Vessels"Juniper" & "Seaker",
Defendants-Appellants.
 No. 80-5067.
 United States Court of Appeals,
Fifth Circuit.
 March 9, 1981.
 
 Reginald M. Hayden, Jr., Miami, Fla., for defendants-appellants.
 Horan & Sireci, David Paul Horan, J. M. Morse, III, Key West, Fla., for plaintiffs-appellees.
 Appeal from the United States District Court for the Southern District of Florida.
 Before GEE, FAY and RANDALL, Circuit Judges.
 RANDALL, Circuit Judge:
 
 
 1
 This appeal marks the third time that Treasure Salvors and its efforts to retrieve treasure from the remains of the Spanish sailing vessel, Nuestra Senora de Atocha, have been before this court. The Nuestra Senora de Atocha sank off the coast of Florida in 1622 while carrying gold and silver bullion from Havana to Cadiz.[1] In 1971 Treasure Salvors located an anchor from the Atocha; since then, Treasure Salvors has continued to conduct salvage operations in the wreck area and has retrieved gold and silver bullion, artifacts and armaments.
 
 
 2
 The first legal battle over Treasure Salvors' rights to the remains of the Atocha began when Treasure Salvors filed an in rem action in the United States District Court for the Southern District of Florida seeking possession of and confirmation of title to the remains of the vessel and its cargo. The United States intervened and counterclaimed for title to the vessel. The district court entered an order granting judgment for Treasure Salvors as against the United States and also decreed that Treasure Salvors had sole title to, and right to immediate and sole possession of, the vessel and its cargo "wherever the same may be found."
 
 
 3
 On appeal, we affirmed the district court's judgment insofar as it resolved the competing title claims of Treasure Salvors and the United States; however, we modified the district court's order by refusing to approve that portion of the order which purported to hold that Treasure Salvors had exclusive title to, and the right to immediate and sole possession of, the vessel and cargo as to other claimants, who were not parties or privies to the action. Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel, 569 F.2d 330, 336 (5th Cir. 1978) (Treasure Salvors I ).[2]
 
 
 4
 The second legal battle over rights to the wreckage of the Atocha involved Treasure Salvors and the State of Florida. In 1971 Treasure Salvors and the State entered into the first of a series of contracts which granted Treasure Salvors the right to conduct underwater salvage operations on the Atocha and gave the State a right to receive 25% of the property recovered as a result of such operations. Both parties entered into these agreements in the belief that the Atocha rested on a submerged reef owned by the State of Florida. Both parties were mistaken in that belief. In 1975, the Supreme Court rejected Florida's claim to ownership of that portion of the continental shelf where the remains of the Atocha rest, United States v. Florida, 420 U.S. 531, 95 S.Ct. 1162, 43 L.Ed.2d 375 (1975). Thereafter, Treasure Salvors instituted an action to recover from the State the artifacts which had been transferred to it pursuant to the terms of the contracts. The district court again entered judgment for Treasure Salvors reasoning, first, that the State of Florida was bound by the earlier judgment in Treasure Salvors I, and alternatively, that the suit to establish title to the artifacts was not barred by the Eleventh Amendment and that, under the law of contracts, the State had no meritorious claim to ownership of the artifacts in its possession. While specifically declining to affirm or reverse the district court's ruling that the State was bound by the holding in Treasure Salvors I, we agreed with the district court's conclusion that the suit was not barred by the Eleventh Amendment and affirmed the judgment of the district court on the alternative contract law theory of mutual mistake. State of Florida, Department of State v. Treasure Salvors, Inc., 621 F.2d 1340 (5th Cir. 1980) (Treasure Salvors II ).
 
 
 5
 This appeal (certain to be christened Treasure Salvors III) arose not out of Treasure Salvors' difficulties with a sovereign but from a controversy between Treasure Salvors and another salvor. In its original action seeking a declaration of possessory and ownership rights to the Atocha, Treasure Salvors had defined the location of the wreck in terms of a circle having a radius extending 2500 yards from a point at coordinates 24o 31' 5 North Latitude and 82o 50' West Longitude. On May 10, 1979, Treasure Salvors filed an amended description of the wreck site claiming that the remains of the Atocha were scattered throughout a corridor 3,000 yards wide which extended from 24o 27' North Latitude and 82o 18' West Longitude, to 24o 33' 42 North Latitude and 82o 27' 42 West Longitude. Treasure Salvors again amended its description of the vessel's location on December 11, 1979, when it declared that it had found another anchor belonging to the Atocha at 24o 30' North Latitude and 82o 15' West Longitude and announced that it was continuing to conduct salvage operations in the area between this point and the site of the first anchor at 24o 31' 5o North Latitude and 82.50' West Longitude. Treasure Salvors continues to claim title to all remains of the vessel and the exclusive right to conduct salvage operations in the area between these points.
 
 
 6
 On December 11, 1979, Treasure Salvors also filed a motion for a temporary restraining order claiming that Olin Frick, John Gasque, William Riley and the Masters of the Motor Vessels "Juniper" and "Seaker" were wrongfully interfering with Treasure Salvors' right to possession and salvage of the Atocha by conducting salvage operations within 1500 yards of the point where the second anchor had been recovered. Treasure Salvors also claimed that threatening shots had been fired by someone aboard one of the defendants' vessels. The district court granted Treasure Salvors' request for a temporary restraining order and later issued a preliminary injunction prohibiting the defendants from interfering with Treasure Salvors' search and salvage operations within an area extending 2500 yards from either side of a line drawn between the two points contained in Treasure Salvors' latest description of the wreck site. Frick and his co-defendants have brought this appeal from that injunction.
 
 
 7
 On appeal two jurisdictional issues, one concerning our ability to review the order entered by the district court at this time and the other involving the district court's power to resolve this dispute, require our consideration. We conclude, however, that neither of these jurisdictional questions bars our consideration of the merits of the injunction. For the reasons set forth herein, we affirm the district court's injunctive order but modify it to provide that it shall expire no later than 90 days following the issuance of our mandate in order to speed resolution of the merits of this unusual dispute.
 
 I. THE APPEALABILITY OF THE INJUNCTION
 
 8
 Under 28 U.S.C. § 1292(a)(1) appeals are permitted from interlocutory orders "... granting, continuing, modifying, refusing or dissolving injunctions ...." There can be no doubt therefore that the district court order granting preliminary injunctive relief to Treasure Salvors would be an appealable order if it had been entered in the course of an ordinary civil case. Treasure Salvors contends, however, that since this interlocutory order was entered in the context of an admiralty proceeding, interlocutory review under § 1292(a)(1) is unavailable and that since the order does not meet the requirements of 28 U.S.C. § 1292(a)(3), which authorizes interlocutory appeals in admiralty from orders "determining the rights and liabilities of the parties to admiralty cases ...," we have no jurisdiction to entertain this appeal. We agree that this order does not fall within the compass of § 1292(a)(3). That section was designed to apply in circumstances distinctive to admiralty where it is not uncommon for a court to enter an order finally determining the issues of liability between the parties and then to refer the case to a master for a determination of damages. Courts have tended to construe this provision rather narrowly and it has not been read to permit interlocutory appeals in admiralty except where the order, regardless of the label affixed to it, had the effect of ultimately determining the rights and obligations of the parties. An order granting one party preliminary injunctive relief clearly fails to meet that criterion.
 
 
 9
 We do not, however, believe that § 1292(a)(3) provides the exclusive authorization for interlocutory appeals in admiralty. In admiralty cases where injunctive orders are entered which would be appealable under § 1292(a)(1) if entered in the course of an ordinary civil proceeding, interlocutory appeals will properly lie under that statutory provision. Prior to the unification of the admiralty rules with the federal civil rules it was generally presumed that the admiralty judge lacked the chancellor's power to order injunctive relief; therefore, the question whether appeals could be taken from such orders in admiralty cases under § 1292(a)(1) was seldom posed. The question did, however, arise in the context of injunctions entered in limitation of liability proceedings which barred prosecution of other actions while the limitation action proceeded. We held that such injunctions, and orders modifying them, were appealable under § 1292(a)(1). Complaint of Muchok, Inc., 578 F.2d 1156 (5th Cir. 1978); Beal v. Walz, 309 F.2d 721 (5th Cir. 1962); Pershing Auto Rentals, Inc. v. Gaffney, 279 F.2d 546 (5th Cir. 1960).
 
 
 10
 For some time now this court has recognized that the 1966 unification of civil and admiralty rules authorized equitable relief in the form of an injunction to be granted by a federal court sitting in admiralty.[3] When such relief is ordered in the course of a proceeding within the court's admiralty jurisdiction we see no legal, logical or policy obstacle to permitting interlocutory appeals of such orders under § 1292(a)(1).[4] As one distinguished commentary has noted
 
 
 11
 "it seems plain that application of § 1292(a)(1) should depend on whether the district court has in fact issued or denied an injunction, not on whether the proceedings are designated as in admiralty. The policies permitting appeal are completely unaffected by the historic distinction between law, equity, and admiralty jurisdiction."
 
 
 12
 16 C. Wright, A. Miller, E. Cooper and E. Gressman, Federal Practice and Procedure 113 (1977).
 
 
 13
 II. FEDERAL COURT JURISDICTION OVER THE PRESENT CONTROVERSY
 
 
 14
 In the course of the extended legal proceedings in which Treasure Salvors has attempted to assert and protect a legal claim to the remains of the Atocha, this court has encountered and resolved numerous jurisdictional puzzles. The original complaint filed by Treasure Salvors was an in rem proceeding in admiralty seeking possession of and confirmation of title to the wreck. The answer and counterclaim filed by the United States asserted first, that the district court lacked in rem jurisdiction over that portion of the wreck which remained under the sea because it was not located within the district (and thus could not grant exclusive possession or title of it to Treasure Salvors) and second, that the United States had valid title to the sunken remains of the Atocha pursuant to the Antiquities Act, 16 U.S.C. § 431 et seq., and the Abandoned Property Act, 40 U.S.C. § 310. The district court, apparently concluding that the location of the sunken wreck did not limit its power to grant an in rem decree affecting it, entered an order granting Treasure Salvors title, as against the whole world, to the vessel and its remains, "wherever the same may be found."
 
 
 15
 On appeal, although acknowledging that the usual predicate for in rem jurisdiction the presence of the res within the territorial jurisdiction of the court was not met, we found that the district court had jurisdiction to adjudicate the interests of Treasure Salvors and the United States in the vessel. We rested that determination on alternative grounds. First, we observed that the situation in Treasure Salvors I was similar to that in several other cases in which courts had reasoned that the absence of the res from the territorial jurisdiction of the court was not fatal to jurisdiction to adjudicate a controversy where the contending parties consented to the court's jurisdiction over their interest in the absent res. In Treasure Salvors I, however, it was not necessary to determine whether to employ this exception to the usual prerequisite for in rem jurisdiction because in that case the claim of the United States was based on federal statutes; thus, there was an alternative basis for jurisdiction under 28 U.S.C. § 1331.
 
 
 16
 The dispute in Treasure Salvors II involved only the question of title to artifacts from the Atocha that had been brought ashore, not a dispute as to rights in the remains of the vessel located offshore. The problem posed in Treasure Salvors II was not whether the court had in rem jurisdiction over the wreck, but whether the district court for the Southern District of Florida had "control" over a sufficient portion of the res to support the issuance of ancillary process in the Northern District of Florida, where the State kept the artifacts it had acquired pursuant to the contract with Treasure Salvors. This requirement that a court have "control" of the major portion of a res in order to issue valid ancillary process is designed to assure that ancillary process is not employed to circumvent the basic jurisdictional requirement that the res be within the district by permitting "the proverbial tail to wag the dog." Treasure Salvors II, supra, at 1347. We concluded that given the peculiar circumstances of the Atocha, this policy would not be undermined by permitting the issuance of ancillary process.
 
 
 17
 Given the jurisdictional obstacle courses encountered and negotiated in Treasure Salvors I and Treasure Salvors II, counsel for both parties in their briefs in this appeal expended much effort discussing the question whether the United States District Court for the Southern District of Florida had jurisdiction to entertain their dispute. At oral argument, however, counsel for the defendants, who had originally contested federal court jurisdiction, acknowledged that jurisdiction was proper. We believe that he undeniably, if belatedly, reached the correct conclusion. The district court has jurisdiction to adjudicate the dispute between Treasure Salvors and the Frick group because it has perfected its in personam jurisdiction over the parties to this dispute and because it has jurisdiction over the subject matter of the controversy pursuant to 28 U.S.C. § 1333.
 
 
 18
 Section 1333 grants federal courts jurisdiction of all cases involving admiralty or maritime claims. Claims arising out of salvage operations efforts to rescue or recover ships disabled or abandoned at sea or to retrieve their cargo are, unquestionably, within the admiralty jurisdiction of the federal courts.[5] The subject matter jurisdiction granted by this statute is not limited to causes of action arising from events or occurrences on the territorial waters of the United States. Pursuant to this grant of jurisdiction,
 
 
 19
 "... (t)he courts of the United States take jurisdiction, subject to some reservations imposed by their own application of the doctrine of forum non conveniens, of suits on maritime claims arising out of transactions and occurrences anywhere in the world."G. Gilmore and C. Black, The Law of Admiralty, 51 (2nd ed. 1975). Since the admiralty jurisdiction of United States courts is not limited by the nationality of the ships, sailors or seas involved and since the principles of the law of salvage are part of the jus gentium, i. e., the international maritime law, United States courts have long adjudicated salvage claims involving foreign vessels, alien salvors and salvage operations occurring on the high seas. See Sobonis v. Steam Tanker Defender, 298 F.Supp. 631 (S.D.N.Y.1969); Barkas v. Cia Naviera Coronado, S.A., 126 F.Supp. 532 (S.D.N.Y.1954); The Bee, 3 F.Cas. No. 1219 (D.Me.1836).
 
 
 20
 The most common type of legal claim arising from salvage operations and asserted in the admiralty courts involves a salvor's assertion of his right to a monetary award which the maritime law provides as an incentive to encourage persons to assist distressed or endangered vessels. The performance of salvage services, like the furnishing of other services to a ship, gives rise to a maritime lien. Thus, a salvor may assert his right to a salvage award either in an in rem proceeding against the salved vessel or cargo or in an in personam proceeding against the owner of the salved property. Awards for performance of salvage services are not limited to a strict quantum meruit measure of the value of the services performed. Rather, the award is calculated to include a bounty or premium based upon the risk involved in the operation and the skill with which it was performed. 3A M. Norris, Benedict on Admiralty: The Law of Salvage, § 235 (7th ed. 1980).
 
 
 21
 A salvor thus has a valuable interest in his salvage operation which the law protects by vesting in the salvor certain rights. Among the most important of these rights are the right to exclude others from participating in the salvage operations, so long as the original salvor appears ready, willing and able to complete the salvage project, and the right to possession of the salved property, a right exclusive even of the owner, until such time as the salvage lien on the property is extinguished or adequate security for this obligation is given. Although the law of salvage grants the salvor a right to possession of the property, the salvage of a vessel or goods at sea, even when the goods have been abandoned, does not divest the original owner of title or grant ownership rights to the salvor, except in extraordinary cases, such as this one, where the property has been lost or abandoned for a very long period. Under these unusual circumstances the maritime law of finds supplements the possessory interest normally granted to a salvor and vests title by occupancy in one who discovers such abandoned property and reduces it to possession. Treasure Salvors I, supra at 336.
 
 
 22
 This type of claim to title by occupancy can, of course, be asserted in an in rem proceeding instituted once the goods have been recovered and brought to shore within the jurisdiction of the court. However, since the law of maritime salvage and finds also protects the right of a salvor who undertakes a project to carry it to completion without interference from others who seek to share in the enterprise and the reward, we think that the admiralty and maritime jurisdiction of the federal courts also encompasses the power to entertain a salvor's claim that another is wrongfully interfering with his ongoing endeavors and to grant such relief as may be appropriate in order to protect a salvor's right to pursue his salvage endeavor exclusively, even though the property which is the subject of the salvage effort might not be within the territorial jurisdiction of the court. The fact that the property which is the subject of the salvage effort is not within the territorial jurisdiction of the court, and thus not subject to an in rem decree, is irrelevant because the salvor's claim is not one in rem seeking to recover against the vessel for salvage in which the in rem fiction is used to personify the vessel and treat it as a party to the litigation. Although rights to the vessel may be the subject of the dispute, the adverse parties in this situation are the competing salvors. Thus, since the court has jurisdiction over them, and the subject matter involves claims based on the maritime law of salvage and of finds, the court is fully competent to adjudicate the dispute regardless of the location of the salvage operations.
 
 
 23
 III. THE PROPRIETY OF THE PRELIMINARY INJUNCTION
 
 
 24
 In reviewing the district court's order granting preliminary injunctive relief to Treasure Salvors, we are mindful that decisions to grant or deny preliminary injunctions rest in the sound discretion of the district court, and are subject to review only for abuse of discretion. Productos Carnic, S. A. v. Central American Beef and Seafood Trading Co. v. United States Cold Storage, 621 F.2d 683 (5th Cir. 1980); Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc., 600 F.2d 1184 (5th Cir. 1979); Canal Authority of State of Florida v. Callaway, 489 F.2d 567 (5th Cir. 1974). Nevertheless, in examining a district court's decision to grant preliminary injunctive relief we are also aware that a preliminary injunction is "an extraordinary and drastic remedy which should not be granted unless the movant has clearly carried the burden of persuasion concerning the existence and application of ... the four prerequisites to such relief." State of Texas v. Seatrain International, S. A., 518 F.2d 175, 179 (5th Cir. 1975). These four prerequisites are: (1) a substantial likelihood that the movant will eventually prevail on the merits; (2) a showing that the movant will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the party or parties opposed; and (4) a showing that the injunction, if issued, would not be adverse to the public interest. Productos Carnic, S. A., supra, 621 F.2d at 683; State of Texas v. Seatrain, supra, 518 F.2d at 179; Canal Authority, supra, 489 F.2d at 573. Although in order to prevail on a request for a preliminary injunction, the moving party must carry the burden on all four elements, this four step analysis is actually a tool to assist the court in answering the essential question determining the propriety of a preliminary injunction, i. e., whether the injunction is necessary to preserve the court's ability to render a meaningful decision on the merits. Canal Authority, supra at 573, 576. Viewed with an eye toward this basic question, the four factors enumerated above become interrelated, rather than independent, inquiries.
 
 
 25
 This interrelationship is most apparent in the case of the first two factors. The question of irreparable harm often cannot logically be considered apart from the question whether the movant is likely to succeed on the merits. In many instances, the irreparable injury against which the movant seeks protection results from infringement of a legal right or interest which will only be established definitively in the proceeding on the merits. In this case, Treasure Salvors, based on its discovery of remnants of the Atocha, claims that it is entitled to prevent the defendants from conducting salvage operations in an area 2500 yards on either side of a line drawn between two points. The district court concluded that there was a substantial likelihood that Treasure Salvors would prevail on the merits of this claim because the court believed that "title to the (Atocha) has already been adjudicated by this court." The district court also found that the mere presence of the defendants within the area which Treasure Salvors identified as containing the remains of the Atocha posed a serious risk of irreparable harm to Treasure Salvors because it would create a situation in which "possession and control of (the Atocha's) remains would be impossible to monitor" and as a result property could be retrieved from the area of the wreck without any means of assuring that this property would ultimately be turned over to Treasure Salvors if, at the trial on the merits, Treasure Salvors was found to have a rightful claim to exclude the defendants from the contested area.
 
 
 26
 Turning to the third factor in the four part analysis, the district court declared that, compared to the harm which Treasure Salvors would be likely to incur in the absence of the injunction, the defendants would suffer only minimal injury as a result of the injunction because they would still be free to conduct salvage operations anywhere in the ocean other than the area claimed by Treasure Salvors. With regard to the question of the effect the injunction might have on any public interests, the court found that the issuance of the injunction would not be a "disservice to the public interest in that the archaeological recovery methods being employed by ... (Treasure Salvors) have greatly benefitted the American public."
 
 
 27
 In this case we find that our appellate review of the district court's injunctive order is limited not only by the narrow legal scope of a review for abuse of discretion but also by serious deficiencies in the record which the parties certified for appeal. The record on appeal in this case is virtually devoid of the pleadings, transcripts or orders from the earlier proceedings involving Treasure Salvors, the United States and the State of Florida. These deficiencies impair our review because the preliminary injunction proceedings themselves were rather brief and many of the district court's conclusions regarding the propriety of the injunction rested not upon evidence actually adduced at the preliminary injunction hearing but upon judicial notice of facts established by evidence presented in the earlier proceedings. Without the record of these earlier proceedings, it becomes extraordinarily difficult, if not impossible, for us to review some of the critical conclusions of the district court.
 
 
 28
 For example, the district court found that there was a substantial likelihood that Treasure Salvors would prevail on the merits of the current dispute because in the earlier proceedings involving Treasure Salvors and the United States, an order had been entered establishing that Treasure Salvors had title to and exclusive rights to possession of the wreck of the Atocha. Amazingly enough, that order and various modifications by the district court to that order are not included in the record on appeal in this case. Of course, in Treasure Salvors I, we expressly refused to affirm that determination and we modified the district court's order accordingly.[6] Consequently, this earlier ruling cannot now support a title claim by Treasure Salvors and thus provides no indication whether Treasure Salvors is likely to succeed on the merits of this dispute.
 
 
 29
 In making a determination whether there was a substantial likelihood that Treasure Salvors would succeed on the merits of the dispute, the district court, unlike this one, had the benefit of the evidence concerning Treasure Salvors' discovery of the wreck of the Atocha and its ongoing efforts to salvage her remains which were developed in the record of the earlier proceedings. This evidence, as well as the testimony given by Melvin Fisher, president of Treasure Salvors, at the preliminary injunction hearing concerning the nature of Treasure Salvors' discoveries in the disputed area and its ongoing salvage operations, was properly available to the district court judge in assessing the likelihood that Treasure Salvors would succeed on the merits. We have before us only the testimony given at the injunction hearing, since the appellant failed to include the earlier evidence in the record on appeal. Thus, although we are somewhat troubled by the conclusion that Treasure Salvors is likely to succeed on the merits, because the resolution of the dispute in this case will require the application of a relatively undeveloped body of law the law of finds to a novel factual setting, and in such circumstances outcomes are generally difficult to forecast, we are unable to find that the district court, possessed of a substantial amount of evidence concerning these facts which is unavailable to us, erred in its conclusion.
 
 
 30
 We are also somewhat disturbed by the district court's analysis of the threat of irreparable harm to Treasure Salvors and its balancing of this harm against that inflicted on the defendants by the injunction. The district court concluded that the mere presence of the defendants within the area designated in Treasure Salvors' request for the injunction, posed a serious threat of irreparable harm to Treasure Salvors because the defendant's salvage activities in the area would be impossible to monitor. The defendants, in their brief on appeal, have urged that Treasure Salvors' interests could have been adequately protected by a less onerous injunctive order which would have permitted the defendants to enter the disputed area and conduct salvage operations with the provision that anything recovered by the defendants would be deposited with the court pending final resolution of the merits.[7] Such an order, the defendants urge, would adequately protect Treasure Salvors and minimize the harm inflicted on the defendants. Under the terms of the injunction entered by the district court the defendants are barred from even entering the disputed area. As a result, Treasure Salvors currently has an exclusive right not only to possession of items it actually recovers but to search the disputed area. Thus, even if the court finally determines that Treasure Salvors is not entitled to exclude the defendants from this entire area in the proceeding on the merits, under the law of finds, Treasure Salvors will have perfected title to any and all objects actually retrieved from the area covered by the injunction during the period the injunction is in force, even though these items may not have been recovered from the area ultimately awarded to Treasure Salvors or even though some of these items turn out not to be from the wreck of the Atocha. In short, during the interim period in which this injunction is in effect, the defendants, as well as Treasure Salvors, may suffer some irreparable harm.
 
 
 31
 Although we are troubled by this possibility, we have been unable to find anything in the record to indicate that at the time Treasure Salvors requested this injunction, the defendants suggested the possibility of a more limited injunction of this sort to the district court. Nor, apparently, have the defendants ever moved the district court to modify the injunction along the lines suggested in their brief. Thus, we are reluctant to find that the district court's order was flawed for failure to consider a potential harm which the defendants did not suggest to the district court.
 
 
 32
 Although the injunction entered here is unquestionably a rather extraordinary one, we are mindful that this case presents a rather extraordinary set of factual problems and very unusual legal questions. In light of these circumstances, we decline to conclude that the district judge, who had the benefit of much greater familiarity with the factual problems presented by the case than we have in view of the state of the record in this case, abused his discretion in entering this injunction. However, given the exceptional nature of this injunction, and the burdens it places on the defendants, we think that the merits of this dispute should be resolved as quickly as possible. For this reason, we modify the district court's preliminary injunction to provide that it shall expire no later than 90 days following the issuance of our mandate. Thus, the parties to the dispute and the district court should arrange for a final hearing on the merits of this controversy during that period.
 
 
 33
 At that hearing, the district court should, as a threshold matter, consider carefully the nature of its jurisdiction in this case. We note that it appears that the petition originally filed by Treasure Salvors invoked the in rem jurisdiction of the court and that to this day the proceeding is styled in rem. However, the propriety of the district court's exercise of in rem jurisdiction over the offshore remains of the Atocha has never been determined by this court. With regard to the current dispute between Treasure Salvors and the Frick group, we have here held only that the district court may properly adjudicate the conflicting claims of these parties because the court has perfected its in personam jurisdiction over the parties and has subject matter jurisdiction over their claims under the general admiralty and maritime jurisdiction granted by 28 U.S.C. § 1333. Should the district court ultimately decide to enter a permanent injunction in this proceeding, the jurisdictional predicate for such a decree should be clearly set forth and considered in defining the scope of injunctive relief.
 
 
 34
 At the hearing, the district court should also be mindful that our modification of the earlier district court order in Treasure Salvors I invalidated the award of title to Treasure Salvors insofar as persons or parties other than the United States were concerned. That order cannot now serve as a basis for granting relief to Treasure Salvors vis-a-vis the defendants in this action. Thus, the district court should now make a fresh and complete record concerning Treasure Salvors' claim to exclude the defendants from this fifty square mile area in light of the basic principles of the maritime law of salvage and finds and such extensions or modifications of those principles as are consistent with the basic policies behind them and required by the extraordinary facts of this case. Because of the virtually uncharted waters the district court will be forced to traverse in delineating Treasure Salvors' rights, we think it appropriate for us to outline the legal doctrine which the court should apply to the facts as they emerge below.
 
 
 35
 As a general rule, under the law of finds, a finder acquires title to lost or abandoned property by "occupancy", i. e. by taking possession of the property and exercising dominion and control over it. It is well established that a finder does not acquire title merely on the strength of his discovery of lost or abandoned property.
 
 
 36
 In Brady v. S. S. African Queen, 179 F.Supp. 321 (E.D.Va.1960), the court was confronted with conflicting claims to the stern of a steamship which split in two and sank off the coast of Maryland. One of the parties had boarded the remains of the stern shortly after the ship sank and after doing so published a newspaper notice announcing his claim not only to the stern but to the entire vessel. Following this preliminary excursion, however, this party took no further action. Several months later the stern still lay undisturbed and another group of salvors began recovery operations. After approximately seven months of continuous salvage operations, this second group succeeded in towing the stern to port, only to be confronted with a claim by the earlier visitor to the stern that possession of it was rightfully his.
 
 
 37
 The court rejected that claim because it found that the first party on the scene had been merely a transitory presence on the wreck and had not actually undertaken any efforts to salvage the vessel and reduce it to his possession. The court reasoned that:
 
 
 38
 "A salvor cannot assert a claim merely by boarding a vessel and publishing a notice, unless such acts are coupled with a then present intention of conducting salvage operations, and he immediately thereafter proceeds with activity in the form of constructive steps to aid the distressed property. When he finally determines that he will, in good faith, conduct such operations and pursues his constructive steps, he is then, and only then, in a position to assert his claim subject to the rights of others which may have intervened while he is exploring the prospects of such operations."
 
 
 39
 Brady v. S. S. African Queen, supra, at 324.
 
 
 40
 A similar problem confronted the court in Eads v. Brazelton, 22 Ark. 499 (1861). In December, 1854, Brazelton went to the site of a sunken barge in the Mississippi River and fastened a buoy to a weight that rested on the wreck; he apparently intended to return with his salvage vessel and begin working the wreck soon thereafter. Brazelton was, however, first, distracted from this task by another salvage operation and then, disabled from the undertaking by a rise in the river which made it impossible for his salvage vessel to pursue the project. In the fall of 1855, Brazelton again headed toward the site of the sunken barge. On the way, however, he was passed up by a swifter vessel belonging to Eads. Eads' salvage ship arrived at the site first, stationed itself over the barge, and began raising its cargo of lead.
 
 
 41
 The Arkansas Supreme Court rejected Brazelton's claim to the cargo recovered by Eads. The court concluded that although Brazelton had marked the wreck site and intended to return and salvage the vessel, he "never attained to the possession of the wreck ... he therefore had no title to it by occupancy." Eads v. Brazelton, supra at 511. Brazelton's conduct fell short of establishing possession because "his intention to possess was useless without detention of the property; he had not found the lead in the required sense of discovering it and taking it up, he was not a finder, in that he had not moved the wrecked property or secured it ...." Id.
 
 
 42
 The law, however, does not always require that one who discovers lost or abandoned property must actually have it in hand before he is vested with a legally protected interest. The law protects not only the title finally acquired by one who finds lost or abandoned property but also the right of the person who discovers such property, and is actively and ably engaged in reducing it to possession, to complete this project without interference from another. The courts have recognized that in order to acquire a legally cognizable interest in lost or abandoned property, a finder need not always have "manual" possession of the thing. Rather, a finder may be protected by taking such constructive possession of the property as its "nature and situation" permit. Id. Thus in Eads, the court emphasized that Brazelton need not have actually raised the lead and put it on board his ship in order to acquire legal protection against interference by others. If Brazelton had merely placed "his boat over the wreck, with the means to raise its valuables, and with persistent efforts directed to raising the lead," Eads v. Brazelton, supra at 511, he would have been deemed to have a legally protected possessory interest in the wreck and Eads would have had no right to interfere with that possession by undertaking his own salvage operations.
 
 
 43
 In Rickard v. Pringle, 293 F.Supp. 981 (S.D.N.Y.1968), two salvors asserted conflicting claims to the propeller of a steamship which had sunk off the coast of Long Island in 1902. In the fall of 1962, Rickard undertook to raise the propeller and conducted salvage operations continuously through the winter of 1962-63. After succeeding in detaching the propeller from the main portion of the vessel, Rickard left the wreck temporarily to make arrangements to bring machinery capable of lifting the propeller to the site. During his absence, Pringle moved in, dragged the propeller away, raised it and sold it. When Rickard sued for the proceeds, Pringle defended by claiming that Rickard had never reduced the propeller to possession and thus had no legally protected interest in it. The court disagreed, finding that although Rickard was temporarily absent, he was "successfully prosecuting the salvage operation and did not abandon it at any time and thus was entitled to the rights of a first salvor legally in possession." Rickard v. Pringle, supra at 984. Those rights include, of course, the right to complete the salvage operation without interference from others and the right to exclusive possession of the property.
 
 
 44
 Although cases involving the principles of the law of finds are few and far between, we think that a basic principle emerges with some clarity from the cases which have considered problems similar to the one presented here. Persons who actually reduce lost or abandoned objects to possession and persons who are actively and ably engaged in efforts to do so are legally protected against interference from others, whereas persons who simply discover or locate such property, but do not undertake to reduce it to possession, are not. This principle reflects a very simple policy the law acts to afford protection to persons who actually endeavor to return lost or abandoned goods to society as an incentive to undertake such expensive and risky ventures; the law does not clothe mere discovery with an exclusive right to the discovered property because such a rule would provide little encouragement to the discoverer to pursue the often strenuous task of actually retrieving the property and returning it to a socially useful purpose and yet would bar others from attempting to do so.
 
 
 45
 These cases also suggest that in determining property rights in lost or abandoned objects, some equitable considerations come into play in determining the legal protection afforded a finder. For example, in Eads v. Brazelton, the court noted that the location of the wreck in controversy was well known. Although Brazelton had marked the site, it did not appear that Eads had relied on those markings in finding the wreck. Thus the court did not think Brazelton's actions in marking the site represented such an investment of skill and effort that equity would suggest that he be afforded some special protection or priority in the conduct of salvage operations on the vessel. In Rickard v. Pringle, by contrast, the court suggested that Pringle had relied on Rickard's buoys and markers in order to find the propeller. Thus, the court may well have been influenced not only by the extent of Rickard's salvage endeavors, but also by some notion of unjust enrichment i. e., a sense that Pringle in retrieving the propeller, had unfairly appropriated the fruits of the labor Rickard invested in discovering the propeller. We think that, in determining the extent of Treasure Salvors' right vis-a-vis the defendants, the district court in this case should examine the facts concerning Treasure Salvors' discovery and salvage of the Atocha from the perspective of these equitable considerations as well as in light of the legal doctrines defining the acts necessary to constitute possession of lost or abandoned property.
 
 
 46
 The judgment of the district court is MODIFIED, AND AS MODIFIED, AFFIRMED. The case is REMANDED for further proceedings not inconsistent with this opinion.
 
 
 
 [1]
 The story of the Atocha and earlier efforts to salvage its treasure is more fully recounted in our previous opinions, Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel, 569 F.2d 330 (5th Cir. 1978) (Treasure Salvors I ) and State of Florida, Department of State v. Treasure Salvors, Inc., 621 F.2d 1340 (5th Cir. 1980) (Treasure Salvors II )
 
 
 [2]
 The basis for our modification of the district court's order is not entirely clear from the opinion; the modification might have reflected a conclusion that the district court lacked jurisdiction to enter such a decree, or simply a determination that, under the law of finds, Treasure Salvors had not proved the facts necessary to establish its title or right to possession as against other claimants
 
 
 [3]
 "Whatever may have been the extent of the equitable power of an admiralty court to issue injunctions prior to the 1966 unification of admiralty and other civil actions, there should be little doubt today that courts of admiralty, in proper cases, may invoke the equitable tool of injunction."
 Lewis v. S.S. Baume, 534 F.2d 1115, 1121 (5th Cir. 1976) (citations omitted). See also Pino v. Protection Marine Insurance Co., 599 F.2d 10 (1st Cir. 1979) (federal courts sitting in admiralty may award injunctive relief in accordance with Fed.R.Civ.P. 65 in situations where this type of relief would be appropriate in other civil actions).
 
 
 [4]
 We disagree with Treasure Salvors' suggestion that Austracan (U.S.A.) Inc. v. M/V Lemoncore, 500 F.2d 237 (5th Cir. 1974), forecloses us from reaching this conclusion. Austracan involved an effort to appeal a district court order dismissing a complaint as to some, but not all, of the defendants. No Fed.R.Civ.P. 54(b) certificate was filed, nor did the district court certify the appeal under 28 U.S.C. § 1292(b). We held the dismissals unappealable. Although there is language in Austracan discussing the propriety of interlocutory appeals from injunctive orders in admiralty, that language is dicta. No requests for injunctive relief were involved, thus dismissal of some of the actions against some of the defendants could not have been construed as an order denying injunctive relief which might properly fall within the compass of § 1292(a)(1). 16 C. Wright, A. Miller, E. Cooper and E. Gressman, Federal Practice and Procedure 69 (1977). Further, the dicta in Austracan relies on case authority established prior to the unification of the admiralty and civil rules, when the propriety of injunctive orders in admiralty was still somewhat questionable
 
 
 [5]
 It seems that there was never any serious doubt that salvage claims fell within the compass of federal admiralty jurisdiction. The Supreme Court assumed that the admiralty jurisdiction included salvage actions as early as 1804. Mason v. The Blaireau, 6 U.S. (2 Cranch) 240, 2 L.Ed. 266 (1804)
 
 
 [6]
 In Treasure Salvors I we stated that:
 "In affirming the district court, we do not approve that portion of its order which may be construed as a holding that plaintiffs have exclusive title to, and the right to immediate and sole possession of, the vessel and cargo as to other claimants, if any there be, who are not parties or privies to this litigation."
 We concluded the opinion by stating that the judgment was modified and, as modified, affirmed. The only reservation we expressed in the opinion was that quoted above. Thus, we think it impossible to understand Treasure Salvors I as saying anything other than that we disapproved the district court's determination that Treasure Salvors had title to the Atocha and modified the judgment accordingly to omit any such decree.
 
 
 [7]
 Apparently this type of procedure was employed to allow Treasure Salvors to continue to conduct salvage operations during the litigation of its dispute with the United States