## TEXAS CITY INDEPENDENT SCHOOL DISTRICT

v.

## Candace JORSTAD and Leon Jorstad, Individually and as Guardians and Next Friends for John Jorstad, and John Jorstad Individually.

### Civ. A. No. G–90–350.

United States District Court, S.D. Texas, Galveston Division.

Dec. 4, 1990.

---

232

Jeffrey L. Rogers, Baker, Brown, Sharman & Parker, Houston, Tex., for plaintiff.

Michael P. O'Dell, Houston, Tex., for defendants.

## DECISION AND ORDER

KENT, District Judge.

On November 21, 1990, came on to be heard Plaintiff Texas City Independent School District's Motion for Preliminary Injunction, seeking to enjoin John Jorstad, a student at the Blocker Middle School, in the Texas City Independent School District, from attending regular classes, as presently provided in an Individual Education Program previously adopted by and between the School District and Mr. and Mrs. Jorstad, John's parents, and instead limiting John's educational participation in such School District to its Behavioral Management Class, at the Blocker Middle School, or home care, at the election of his parents, pending completion of administrative review of John's educational status, under applicable provisions of law, and the Court being of the opinion for the reasons hereinbelow discussed in detail, that the Motion is in order, and should be granted, the Court herewith makes the following Findings of Fact and Conclusions of Law and so enjoins Candace Jorstad and Leon Jorstad, individually and as guardians and next friends of John Jorstad, and John Jorstad, individually.

## PROCEDURAL HISTORY OF THE INSTANT ACTION

On November 4, 1990, Plaintiff, Texas City Independent School District, (hereinafter referred to as "School District"), filed Plaintiff's Original Complaint for Injunctive Relief, and Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction, together with substantial affidavits and attachments. Also filed, was a Memorandum of Authorities in support of Plaintiff's Request for Temporary Restraining Order and Preliminary Injunction. A Temporary Restraint hearing was held before the Honorable Lynn Hughes, United States District Court for the Southern District of Texas, Houston Division, on November 14, 1990, and that Court entered a Temporary Restraining Order, further ordering the parties to appear before the Honorable Samuel B. Kent, in the Galveston Division, where this matter remains pending, for a hearing on the Preliminary Injunction, on November 21, 1990. On that date, timely responsive pleadings were filed by Defendants Candace Jorstad and Leon Jorstad, individually and as guardians and next friends of John Jorstad, (hereinafter referred to as "Parents"), and John Jorstad individually, (hereinafter referred to as "John"). Following a day long hearing, also on such date, involving the testimony of seven witnesses, this Decision and Order follows.

## APPLICABLE LAW

This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331, 20 U.S.C. § 1415(e)(2), and F.R.C.P. Rule 65(a).

The Education of Handicapped Act, (hereinafter referred to as "E.H.A."), 20 U.S.C. § 1400, et seq., provides in significant detail for the education of handicapped individuals. 20 U.S.C. § 1415 provides, also in detail, for the administrative rights of affected persons, and educational institutions, in administering the Act. Specifically, this section establishes specific administrative review obligations, which must be exhausted before either party is entitled to seek relief from a Federal District

Court, as regards the educational needs of any individual. Concurrently, and notwithstanding the provisions of such section, allegedly aggrieved school districts may seek injunctive relief from Federal District Courts, during the pendency of the resolution of administrative review of educational plans, pursuant to F.R.C.P. 65(a), in very limited circumstances. The Supreme Court has held, in *Honig vs. Doe*, 484 U.S. 305, 328, 108 S.Ct. 592, 607, 98 L.Ed.2d 686 (1988), that while 20 U.S.C. § 1415(e)(3) "effectively creates a presumption in favor of the child's current educational placement", school officials can seek injunctive relief, pursuant to 20 U.S.C. § 1415(e)(2), where the school district can successfully overcome such presumption by showing that "maintaining the child in his or her current placement is substantial likely to result in injury to either himself or herself, or to others." In considering such relief, the District Court is obligated to balance the affected child's "interest in receiving a free appropriate public education in accordance with the procedures and requirements of the E.H.A. against the interest of the State and local school officials in maintaining a safe learning environment for all of their students." *Honig vs. Doe, supra,* at 328, 108 S.Ct. at 607. It is expressly noted that injunctive relief, pursuant to F.R.C.P. Rule 65(a), is an "extraordinary and drastic remedy," and that relief of this nature is the exception rather than the rule. *U.S. vs. Lambert,* 695 F.2d 536 (11th Cir.1983). A party seeking injunctive relief must carry the burden of persuasion on each of four distinct elements:

   (1) A substantial likelihood that plaintiff will prevail on the merits;

   (2) The threatened injury to plaintiff outweighs the threat of harm to defendant;

   (3) A preliminary injunction will not disservice the public interest; and,

   (4) A substantial threat that the plaintiff will suffer irreparable harm if the injunction is not granted.

*Treasure Salvors vs. Unidentified Wreck, Etc.,* 640 F.2d 560, 568 (5th Cir.1981), *Texas vs. Seatrain Int'l. S.A.,* 518 F.2d 175, 179 (5th Cir.1975).

## FINDINGS OF FACT

(1) Under the provisions of the E.H.A., each handicapped student must have an individualized educational program developed by qualified school officials and the children's parents. 20 U.S.C. § 1401(19). In Texas, the individualized educational program for each handicapped child is prepared by an "admission, review and dismissal" (ARD) Committee, comprised of a representative from the school district administration, a representative from the school district instructional program, and the student's parents. 19 Tex.Admin.Code § 89.221.

(2) Mr. Richard Carter is the Building Principal at Blocker Middle School, T.C.I.S.D. John Jorstad is a student at such school. Mr. Carter knew John would be enrolled, for the 1990–91 school year, as John had completed, during the spring of 1990, the curriculum at Levi Fry Elementary School, in T.C.I.S.D. An ARD Committee was convened on April 25, 1990, for purposes of developing an individualized education program (hereinafter referred to as "I.E.P.") for John, specifically including a behavior modification plan to be implemented in the least restrictive environment, namely the resource and mainstream setting rather than the self-contained behavioral modification classroom, (hereinafter referred to as "B.M.C."). Mr. Carter had attended this meeting, and was aware of the nature and extent of John's general problems. John is a thirteen (13) year old handicapped student, classified as emotionally disturbed, learning disabled and speech handicapped. John has been diagnosed as exhibiting a psychotic disorder and frequently exhibits noncompliant and maladaptive behaviors.

(3) During the Summer of 1990, John and his parents and school personnel toured the Blocker Middle School campus, to ameliorate John's anxiety about making a campus move. Mrs. Jorstad also suggested the prompt retention of an appropriate individual aide, to assist John with his studies, and unfortunately this was not undertaken until very late in the Summer.

Notwithstanding that delay, school district personnel, Mrs. Jorstad and relevant professionals discussed John's pending enrollment on at least a couple of occasions. In-service training was provided to key teaching personnel, and brief instructions were provided by the treating professionals to the individual aide to assist John. Mrs. Mary Alvarez, a functional psychologist, prepared a behavior modification plan, (hereinafter referred to as "B.M.P."), and spent approximately two hours' total time, on separate occasions, training the individual aide and other school personnel, regarding John's individualized needs.

(4) The school year started with some promise, for John, but has deteriorated progressively. Mr. Carter testified that John has been manifestly disruptive on innumerable occasions. He has received numerous complaints from parents, teachers and others, regarding John's conduct. He has been called to assist teachers, on several occasions, regarding disruptions, and where John has been physically aggressive. John has frequently struck other students, and has run away from his individual aide. He has entered the classrooms of other teachers, and has locked himself in another teacher's classroom. He has twice tried to jump out of second floor windows, and on a third occasion, successfully exited a window, on the second floor, some twenty feet above some concrete steps, at considerable peril to himself. On two occasions, he has darted into a nearby roadway, from a physical education class; on one occasion even taunting a car to strike him. John's propensity for extremely loud and wide ranging profanity is significant, and frequently disruptive. This profanity is used throughout both classroom and hallway settings. He has, on several occasions, threatened to kill himself, and others. Mr. Carter further testified that John has caused substantial physical damage to school property, including the virtual destruction of a "time out" room, including: the tearing off of a wooden molding from the door jam; the ripping up of metal strips, including screws, from the door; the tearing up of carpet tack rails, and swinging them wildly over his head; the removal of carpet from the floor and walls of the "time out" room; the destruction of a peep hole into that room; the severe scratching and virtual destruction of a window into that room; as well as additional damage to desks, books, and other items of school equipment; and, the tearing out of curtains and decorations, and numerous other minor articles. He has also destroyed one student's ring, pens and pencils of other students, and other minor personal belongings of still other students. Mr. Carter testified that John has been involved in approximately thirty physical assaults on teachers, staff, his individual aide, and other students, and innumerable verbal assaults, at least six of which having occurred in his presence. Mr. Carter considers John to be severely dangerous to himself, and to present an ongoing "major" threat to others, as well as to himself.

(5) Mrs. Julie Puckett, a career investigation teacher at Blocker Middle School, teaches John in eighth period, from 2:00 P.M. to 2:45 P.M., each school day. She has seen John act aggressively in six individual incidents. On one occasion, he pestered her daughter, who is also a student in the class, severely, and at the end of class, approached her, and without provocation began hitting her. He has taken objects from other students, and otherwise taunted them, and when they have reacted, he has hit, kicked, or otherwise assaulted them, on several occasions. He has stabbed Mrs. Puckett with a pen, although he did not cause significant injury. He has threatened her with injury and death, on several occasions, and has frequently threatened to kill or harm other students. He frequently uses profanity to provoke other students. His behavior is extremely unpredictable and sudden, and despite the continuous presence of his individual aide, his aggressive actions cannot be initially controlled. On each of the six incidents Mrs. Puckett has personally observed, he was able to land at least one blow, on another student, before the effective intercession of the individual aide. He has frequently clung to her neck and clothes and pulled on her arms and hands, when the individual aide is

attempting to remove him from the classroom, and on one occasion, he "body slammed" into her, before the individual aide could come to her rescue. There are twenty-eight other children in the class, and they are constantly aware of his behavior. His behavior creates real concern and anxiety on the part of the other students, and their learning performance level has fallen off dramatically. Indeed, virtually ninety to ninety-five percent of Mrs. Puckett's elective time is spent dealing with John, and not with other students. Her failure rate for academic performance for a number of other students has increased alarmingly. He frequently disrupts test periods, even including important "six week" tests. On one occasion, he tried to go out of a second floor window, in her class, and was only pulled back with her assistance, and that of the individual aide. If he had been able to successfully exit the window, there is no ledge outside, and he would have, in her opinion, fallen some twenty feet, onto concrete below, resulting in his probably severe injury.

(6) Robert Whitener is the educational aide individually assigned to assist John, in the execution of his school curriculum. He has had one previous semester of similar work, with another student, albeit one not as severely disabled as John. He graduated from Texas City High School in 1981. He subsequently received a Bachelor of Business Administration from the University of Houston, Clear Lake, and he has studied educational psychology since graduation. He also has some training in other non-related fields. He is not a certified teacher, but is qualified for the position he is presently employed in. While conceding that he was only employed shortly before commencement of the school year, he indicated that he received specific training from Mrs. Mary Alvarez, John's consulting psychologist, and that he was thoroughly indoctrinated in the terms and provisions of the individual educational plan in place for John. He feels qualified to assist John.

Mr. Whitener is faced with a thankless task. Under the terms of the plan, he cannot chase John down the hall, but must follow him at a walk. This creates major problems, because John frequently bolts from him, running down the hall well ahead of him. This has resulted in John's attempted exits from second story windows on two occasions, and actual exit from a second story window, out onto a ledge, some twenty feet above the concrete steps below. John has also darted into a roadway from a P.E. class, on two occasions, one time taunting the driver, and has caused numerous problems in the halls and lunchroom of the school. He is also proscribed by the individual education plan from sitting next to John, in class; instead, being required to sit away from John, to avoid astigmatizing John. Unfortunately, this allows John substantial physical latitude, given his impulsive nature, for moving toward other students, and both about and out of classes. While John is a relatively diminutive individual, being approximately five foot two inches tall, and weighing approximately one hundred pounds, he is possessed of remarkable physical strength. Mr. Whitener testified that John is very difficult to restrain, even when using specific techniques he has been taught. He has been struck severely in the groin by John, on one occasion, and has received other minor injuries, as a result of John's physical actions. He has had to intercede, in stopping John from attacking other students, on numerous occasions. He has no control whatever over John's virtually constant verbal assaults and outbursts. Based on his personal observations, Mr. Whitener feels that John is a very real danger to himself and to others. He has seen him throw pens at other students, damage school property, damage the property of other students, and manifest other dangerous and inappropriate behavior.

(7) Margaret Genotte is a resource teacher, at Blocker Middle School. Her job is basically to matriculate children from resource classes, which are calculated to address the needs of disabled children, up to the normal level of general academic classes. She deals with John in both a classroom setting, and in "content mastery", which involves essentially specialized individual teaching of John, specifically as

regards mathematics. She feels that John has the academic skills to master seventh grade level math work, but he has severe attitudinal and behavioral problems. She has seen John attack other people on numerous occasions. She is relatively diminutive herself, and he has grabbed her by the neck and by the arms on several occasions, causing her minor injury, but real fear. She considers him to be completely disruptive, and virtually impossible to keep "on task". John takes a great deal of time from her. Indeed, during normal forty-five minute increments, he will require as much as forty minutes of the time, leaving her virtually unavailable to assist the more than twenty other children in her class. He has tried to climb out one of her windows, as well, despite the fact that his individual aide was in the room. He has pulled down her class decorations, and has created a number of disturbances. He is virtually constantly aggressive. She considers John a severe threat to his own personal safety, and the safety of herself and others in her class. She feels that John would distinctly benefit from the specialized attention he would receive in a behavioral management class, which could give him a more structured environment than he could possibly receive in a general class environment, while being identical from an academic standpoint.

(8) Rose Marie Drake is the "Center Director", for special education services in the Texas City Independent School District. She undertakes ARD's and manages resource teachers, and special education needs. All of John's teachers report to her, administratively. She has personally observed John's behavior in classrooms and hallways. She has seen him push and strike other students on numerous occasions, and saw him severely strike a female student on the shoulder, and then chase the student down the hall, despite her intercession. She testified that his yelling in the hallway is audible literally one hundred feet away, and is extremely disruptive. She also feels that John would substantially benefit from a behavioral management class environment, and that he is not making significant progress in his general class

environment. She also supervises the duties of the individual aide, Mr. Whitener, and feels he is executing his responsibilities diligently and properly. At an ARD meeting, she specifically questioned limitations on the aide's ability to sit in proximity to John, and to otherwise restrain him, but her suggestions were not heeded. She expressly testified that in the behavioral management class, all classes are in one setting. A student must work through a specific type of behavioral modification exercises, the successful culmination of which allowing the student to work him or herself back into mainstream classes. This is by no means a permanent assignment, and frequently does not last more than a few weeks. It does, however, require real effort from the student, and can be significantly beneficial in modifying the maladaptive behavior of individual students. She feels that John would distinctly benefit from such a curriculum.

(9) Dr. Shavon Peacock is a staff psychologist with the Texas City Independent School District. She has a Ph.D. in psychology, and specific training in school psychology. She has worked in several educational institutions, particularly including a public school setting, before her employment with T.C.I.S.D. Her most recent employment was at the Richmond State School, where she worked with severely emotionally disturbed children. She has worked with a number of emotionally disturbed children such as John, and has prepared numerous, specific individual educational programs, for such students. She began work at Blocker Middle School in September, 1990, and has dealt with John on a daily and weekly basis. She works with John once a week, in individual therapy sessions, lasting thirty minutes, regarding achievement of social skills. She testified that John is extremely disruptive, and that she has personally had to restrain him on more than one occasion. John is emotionally disturbed, and has profound problems in controlling his behavior. She considers him, on the basis of her experience and expertise, to be a real and virtually constant threat to himself and to others.

Moreover, she considers him to be a continuing threat, whose behavior has specifically deteriorated, over the last couple of months. She feels that he is inappropriately suited to a general class environment because his maladaptive behavior does not result in his receiving adequate and prompt "consequation". In other words, there is too long a lag between the punishment he receives, which is specifically limited to removal from class and "time out", in a specially constructed room well away from his academic setting, and the behavior which justifies such a sanction. It is her professional opinion that John would substantially benefit from education in the school behavioral management center, where he would receive prompt sanctions for his maladaptive behavior, and prompt rewards for his correct behavior. It is her concern that even if efforts were undertaken to "tighten the reigns" in John's present environment, it is a standardized psychological phenomenon that such an individual would react negatively to such increased constraint. Therefore, increased maladaptive behavior is predictable, and very likely. Even assuming increased efforts to restrict John's behavior in his present setting, such would only result in more aggressive behavior. She feels that the only way to control this is to place John in a behavioral management class long enough to allow him to functionally regain control of his manifestly inappropriate behavior. She also emphasized that this is not a permanent assignment, and one that John can relatively quickly work his way out of, should he elect to do so. She feels that he certainly has sufficient intellectual and emotional skills to undertake this effort. She has worked closely with and formulated the B.M.C. program, at Blocker Middle School, and feels that it works well. She testified that it is based upon commonly accepted psychological principles. A transfer of John to the B.M.C. class will not cause him any detriment, in her opinion, and can only enhance his overall behavior, even notwithstanding initial disruptive activities, given his predictable response to a more restrictive environment.

(10) Mary Alvarez is a functional psychologist, who has assisted John and his family over the last two years. She has a Bachelor of Science and Master of Science in psychology, and testified that she is "one and one-half years away" from receiving her Ph.D. in psychology, from the University of Houston. She currently has three years of experience with emotionally disturbed children, operating out of the Mainland Psychology Association. She has treated "several hundred" children, over the last three years, including some with problems as severe as John's. She has treated John for two consecutive years. She has sought to increase his adaptive behavior, by increasing his social skills. She was initially hired by the school district to assist John, but has also been retained directly by his parents, to assist in formulating an individualized education program, and home care. She has spent a considerable amount of time working with Mrs. Jorstad, in teaching her various mechanisms to deal with John's home behavior, and is thoroughly familiar with and has participated in the ARD process. She concurs that John has significant learning disabilities, and linguistic problems. These affect his behavioral, social and academic skills, concurrently. She concurs with Dr. Peacock that any change in John's present condition is likely to increase his maladaptive behavior, for some initial period. She and Dr. Peacock part company, however, in an assessment as to the efficacy of assignment of John to a behavioral management class. She feels that such a program would be, in the long term, unduly restrictive, and therefore detrimental to John's overall development. Unfortunately, she is unable to provide the Court with any assurance whatsoever that any modification she could suggest to the existing individual education plan would have any likelihood of success, in promptly ameliorating John's manifestly inappropriate school behavior, or the likelihood of his continuing to constitute a real and persistent danger to himself and to others. Given that circumstance, and bearing in mind that she would have primary responsibility in assisting the Jorstads in formulating a revised plan, it is

unlikely that a compromise could be reached between the Jorstads and T.C.I.S.D., on an immediate basis, which would allow for a modification of his individual educational plan, to sufficiently ameliorate his ongoing behavioral problems, while at the same time dealing with his long term education and training.

## CONCLUSIONS OF LAW

(1) In consideration of the overall deterioration in John's behavior, and culminating with the window ledge incident, which occurred on October 12, 1990, an ARD meeting was called, suggesting a modification in John's individual educational plan. The plan basically called for John's placement in the behavioral modification class. Further discussions were held in a second ARD meeting, on November 1, 1990, which has resulted in an impasse. The E.H.A. requires that the parents be notified in writing of proposed changes in the I.E.P. and that they be given an opportunity to bring complaints about "any matter relating to the identification, evaluation or educational placement of a child". 20 U.S.C. § 1415(b)(1)(C) and § 1415(b)(1)(E). Parental complaints regarding the educational placement of a child are subject to administrative due process hearing procedures under the E.H.A. 20 U.S.C. § 1416(b)(2). During the pendency of any administrative proceedings conducted under the E.H.A., unless the school district and the parents agree otherwise, the child shall remain in the then current educational placement of such child, (i.e., the placement the child was in before a change was proposed). 20 U.S.C. § 1415(e)(3). Except, of course, that under limited circumstances, school officials may seek injunctive relief to change the educational placement of the child when maintaining that the child's current placement is "substantially likely to result in injury either to himself or herself, or to others". *Honig vs. Doe,* 484 U.S. 305, 328, 108 S.Ct. 592, 607, 98 L.Ed.2d 686 (1988).

(2) This Court concludes that on the basis of overwhelming testimony, John presently constitutes a severe and on-going threat of imminent danger to himself and to others, and consequently the Court considers injunctive relief appropriate, pursuant to the Supreme Court's ruling in *Honig,* and F.R.C.P. Rule 65(a).

(3) The Court further concludes that T.C.I.S.D. has sustained its extraordinary burden in seeking injunctive relief, in that it has demonstrated:

(1) a likelihood of irreparable injury to Plaintiff, in that if John should continue to display physical aggression to students and teachers, in his present environment, it is entirely likely that serious injury will occur, either to himself or to others;

(2) there is a significant likelihood of success on the merits, because the testimony is overwhelming and uncontroverted that John's acts of physical aggression and his demonstrated propensity to engage in behavior that is dangerous to himself and to others is ongoing, virtually constant and well-documented;

(3) that in balancing the potential harm inherent in injunctive relief between the parties, the Court concludes that John will not suffer any realistic harm, notwithstanding the somewhat contrary testimony of his consulting psychologist, Mrs. Mary Alvarez, by virtue of his temporary placement in the behavioral modification class, or in-home study, pending completion of the administrative review process, and indeed, according to the testimony of Dr. Peacock, he will significantly benefit from such a regimen. (Moreover, the threat of harm to himself or to others will be thereby eliminated); and finally,

(4) the public interest is served, in the Court's view, because John will be taken out of an inherently dangerous environment, and will be placed in a more structured environment which will cause him no undue injury, during the pendency of administrative review.

*U.S. vs. Lambert,* 695 F.2d 536 (11th Cir. 1983); *Treasure Salvors vs. Unidentified Wreck, Etc.,* 640 F.2d 560, 568 (5th Cir. 1981), *Texas vs. Seatrain Int'l. S.A.,* 518 F.2d 175, 179 (5th Cir.1975).

## DECISION

On the basis of the foregoing findings and conclusions, it is the ORDER of this Court that Candace Jorstad and Leon Jorstad, individually and as guardians and next friends of John Jorstad, and John Jorstad individually, are hereby enjoined from returning John Jorstad, as a student in the general curriculum of Blocker Middle School, Texas City Independent School District; and instead, it is the further

ORDER of this Court that John Jorstad be limited to enrollment in the behavioral modification class of Blocker Middle School, or at the election of Mr. and Mrs. Jorstad, that he undertake a home study program, with the assistance of the Texas City Independent School District, such assistance being guaranteed by the School District pursuant to express stipulation of counsel for such, in the record of this proceeding; either such placement continuing until completion of administrative review. It is further

ORDERED, that counsel for the parties undertake the prompt conclusion of the administrative review presently underway, pursuant to the applicable terms and provisions of the Education of the Handicapped Act, and that this Order be presented as constituting a protective order, to all interested parties, who might otherwise attempt to engage the time and activities of said counsel, pending completion of such administrative review. The Temporary Restraining Order heretofore entered in this case is hereby vacated, having been superseded by the instant Order. Finally, it is further

ORDERED, that the Texas City Independent School District not be required to file a Bond at the present time. The Court retains jurisdiction in this matter, for purposes of administering such further relief as might be just in the circumstances.

If any of the foregoing conclusions constitute findings, or the foregoing findings constitute conclusions, they are adopted as such.