SEA LIFT, INC., a Florida
corporation, Plaintiff,

v.

REFINADORA COSTARRICENSE DE
PETROLEO, S.A., a foreign corpora-
tion, a/k/a RECOPE, Defendant.

No. 81–2744–Civ.

United States District Court,
S.D. Florida.

Dec. 27, 1984.

C. Douglas Skinner, Miami, Fla., for plaintiff.

Arthur Roth, Miami, Fla., for defendant.

## MEMORANDUM OPINION CONTAINING FINDINGS OF FACT AND CONCLUSIONS OF LAW

ARONOVITZ, District Judge.

### NATURE OF THE CASE

THIS CAUSE was tried to the Court non-jury on October 9–10, 1984. The case arises from a marine salvage contract which was executed in 1980 by the Plaintiff, Sea Lift, Inc. (hereinafter "Sea Lift"), and the Defendant, Refinadora Costarricense de Petroleo, S.A. (hereinafter "RECOPE"). Federal jurisdiction is based upon the general admiralty jurisdiction of the Court, 28 U.S.C. § 1333, and in the alternative, diversity of citizenship, 28 U.S.C. § 1332. The Court has heard the testimony of lay and expert witnesses, received several exhibits, examined the entire court record, and has heard Oral Argument by respective counsel. Accordingly, there is herewith entered this Court's Findings of Fact and Conclusions of Law based upon the aforegoing.

### FINDINGS OF FACT

1. Plaintiff Sea Lift is a Florida corporation with a principal place of business in Dade County, Florida. Sea Lift is primarily engaged in the marine salvage business, and at the time that it performed the salvage operation which gave rise to this lawsuit, Sea Lift operated the tugboat HERMES and the S/V SALVAGER.

2. Defendant RECOPE is a Costa Rican company that owned the booster barge HC–24. At the time that it capsized, the HC–24 was being used in a dredging operation at Port Moin, Costa Rica where RECOPE was expanding the harbor and building a new port facility.

3. On June 20, 1980, while it was moored adjacent to a pier at Port Moin, the HC–24 began taking on water during a storm. Employees of RECOPE towed the sinking barge around the jetty and out to sea. By the next morning the vessel had capsized and "turned turtle," so that a portion of the vessel's hull peered above the surface of the water.

4. RECOPE had insured the vessel with the Instituto Nacional de Seguros (hereinafter "Seguros"), which reinsured part of the value of the vessel with Lloyds Underwriters (hereinafter "Lloyds").

5. Between June and August, 1980, officials of London Salvage, an affiliate of Lloyds which is located in New York, contacted the Plaintiff in Miami, Florida, and solicited Sea Lift's services to salvage the booster barge HC–24. Agents of London Salvage journeyed from New York to Miami to discuss the salvage operation and to solicit the contract with Sea Lift. At all times material hereto, these representatives of Lloyds were acting for, and in

behalf of, RECOPE and RECOPE's underwriters.

6. During these negotiations, certain Sea Lift officials traveled to Costa Rica to survey the barge and to determine a reasonable price for the salvage operation. A price was eventually agreed upon by the parties.

7. On August 5, 1980, José Antonio Lara Eduarte, a RECOPE official, signed the salvage contract which is at issue in this case. Shortly thereafter, the contract was sent to Miami where it was executed on behalf of Sea Lift. The salvage agreement therefore became a binding contractual agreement when executed in and at Miami, Florida, and was thus the ultimate product of the visit of London Salvage to Miami and its solicitation of Sea Lift.

8. The contract is a Lloyds standard form Salvage Agreement/No Cure—No Pay, which has been modified by the parties. The Lloyds standard agreement is the most widely used salvage contract in the world. Usually, a fixed price is not stated in the contract, and the parties rely upon an elaborate arbitration procedure to determine the amount which is owing. Gilmore and Black, *The Law of Admiralty* (2d ed.) 583; Kennedy, *The Law of Civil Salvage* (4th ed.) 302. In the case *sub judice*, however, the parties have fixed and stipulated to a sum certain for the "no cure—no pay" salvage of the booster barge. While apparently there is a version of the Lloyds standard form which leaves a blank or space to fill in a fixed sum, the form used by the parties has no such designated space, and the parties amended the form by stating the agreed sum in a footnote on the first page of the document.

9. In addition, the parties agreed to an entirely separate and distinct amount for refurbishing the vessel, should the salvage operation be successful. This second amount would be part and parcel of a second and separate contract.

10. The agreed sum for Sea Lift's "no cure—no pay" salvage services, which is stated in English and in Spanish on the front page of the contract, was $265,000.00.

The second sum which would have been fixed in a separate, refurbishing and restoration contract, was $105,000.00. This second fixed amount appears in a note in English and in Spanish on the last page of the contract.

11. The existence of this additional agreement to negotiate a second contract for restoring and refurbishing the booster barge clearly bears on the intent of the parties vis-a-vis the primary, "no cure—no pay" salvage contract. Specifically, the intent of the parties with respect to the meaning of the phrase "no cure—no pay" can better be inferred, as it is clear that neither restoration nor refurbishing of the vessel was contemplated by the parties as included in the task of "cure" or "curing the vessel" by "salvaging" it, *per se*.

12. The contract does not in so many words specify the place at which payment should be made, but the fact that the parties agreed that payment was to be made in United States currency also has some bearing on the parties' intent in this regard.

13. The sunken booster barge was a marine peril, especially in light of RECOPE's plans to expand the harbor at Port Moin. Apart from the further damage to the barge which would have resulted if it were not salvaged, for other reasons it thus behooved RECOPE to have the barge righted and taken from the waters around the jetty and port facility.

14. Before it capsized in the storm, the booster barge had a large centrifugal pump which was driven by a 16 cylinder diesel engine through a reduction gear. There is a strong possibility that the engine had been removed from the vessel prior to the storm on June 20, 1980. After the barge was righted, the engine could not be found, and there was no sign of stress in the area where the engine had been lodged. The pump and the reduction gear have been located either on the vessel, or near the spot where it flipped and sank.

15. Shortly after the contract was executed, the S/V Salvager and the tugboat Hermes embarked for Costa Rica. The

two vessels arrived at Port Moin and commenced the salvage operation in September, 1980.

16. From September to November, 1980, employees of Sea Lift prepared the booster barge for "righting," i.e., turning it rightside up, by applying apoxy to the vessel's hull. The barge was substantially rusted and the hull was riddled with pores and holes.

17. During the months of November—December, 1980, severe storms impaired the salvage operation. At one point in December, 1980, the S/V Salvager was severely damaged, and Sea Lift expended approximately $200,000.00 to repair its vessel.

18. After the bad weather passed, the salvage operation continued. In March, 1981, the booster barge was finally righted.

19. While the contract indicates that the barge was to be taken to Port Limon, Sea Lift was directed to leave the barge on the jetty at Port Moin due to its condition.

20. The booster barge is still beached on the jetty at Port Moin. In its present state, the booster barge is worthless as an operating vessel, and apparently cannot be used for scrap.

21. RECOPE has failed and has refused to pay any amount to Sea Lift for the salvage operation, and RECOPE has ignored Sea Lift's demands to pay on the basis that the barge is worthless.

## CONCLUSIONS OF LAW

### Background

22. Before submitting its responsive pleading in this case, Defendant RECOPE filed three motions to dismiss raising issues of insufficiency of service of process, lack of *in personam* jurisdiction, and forum non conveniens.

23. Plaintiff Sea Lift's first attempt to serve process was insufficient under Rule 4(i), Fed.R.Civ.P., and §§ 48.181, 48.161, Fla.Stat., and the Court granted Defendant's first motion to quash on January 28, 1983. The affidavit of Plaintiff's process server failed to demonstrate that he was qualified to serve process in Costa Rica, and did not mention who the individual was who accepted service on behalf of RECOPE.

24. Plaintiff's second attempt to serve process on RECOPE was also deficient, failing to meet the requirements of Rule 4(i)(C) and (D), Fed.R.Civ.P., and Defendant's second motion to quash was granted on August 4, 1983.

25. Finally, in August and September, 1983, Plaintiff submitted sufficient evidence of service of process complying with the applicable rules of civil procedure, and Defendant did not renew its objection on grounds of insufficient service of process.

26. After submitting its responsive pleadings, however, in January, 1984, Defendant RECOPE filed a renewed motion to dismiss on grounds of lack of *in personam* jurisdiction and forum non conveniens. In addition, RECOPE alleged that the Court did not have jurisdiction over the subject matter of the lawsuit.

27. Although the Defendant's renewed motion to dismiss was denied, it raised several important issues which deserve further consideration by the Court.

### Subject Matter Jurisdiction

28. In its pretrial motions Defendant was not as precise as it might have been regarding the basis for its claim of lack of subject matter jurisdiction, but such a claim is a serious allegation which may be raised at any time, even by a mere "suggestion of the parties." Rule 12(h)(3), Fed.R.Civ.P.

29. Plaintiff has attempted to invoke both 28 U.S.C. § 1332 and § 1333 as independent bases for federal jurisdiction, and indeed, the claim herein is cognizable both in admiralty and under grounds of diversity of citizenship.

### A. Diversity Jurisdiction

30. In 28 U.S.C. § 1332, Congress vests original jurisdiction in the federal courts in cases where the amount in controversy ex-

ceeds $10,000.00, and involve one of four categories of parties.

31. There is no question that the amount in controversy exceeds $10,000.00, and the parties have stipulated that RE-COPE is a foreign corporation, while Sea Lift was incorporated under the laws of Florida.

32. 28 U.S.C. § 1332(c) states that for purposes of diversity of citizenship, a corporation is deemed a "citizen of any state by which it has been incorporated and of the state where it has its principal place of business."

■ 33. As this is a lawsuit between a citizen of a State and a citizen of a foreign state, involving an amount in controversy in excess of $10,000.00, it is clear that this Court has jurisdiction over the subject matter under 28 U.S.C. § 1332(a)(2).

**B. Admiralty Jurisdiction**

34. In 28 U.S.C. § 1333, Congress vests original and exclusive jurisdiction in the district courts of "any civil case of admiralty or maritime jurisdiction ..."

35. In *Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel*, 640 F.2d 560 (5th Cir.1981), the Court stated, "claims arising out of salvage operations ... are, unquestionably, within the admiralty jurisdiction of the federal courts."

36. The point was elaborated in a footnote in *Treasure Salvors:* "It seems that there was never any serious doubt that salvage claims fell within the compass of federal admiralty jurisdiction. The Supreme Court assumed that the admiralty jurisdiction included salvage actions as early as 1804." *Id.* at 566, citing *Mason v. The Blaireau*, 6 U.S. (2 Cranch) 240, 2 L.Ed. 266 (1804).

37. While it is difficult to characterize the case *sub judice* as anything but a "claim arising out of a salvage operation," it is important to distinguish two types of marine salvage claims.

38. *Treasure Salvors*, for example, involved a non-contractual salvage operation.

There was no agreement with the vessel's owner when Treasure Salvors, Inc. undertook to recover the Eighteenth century treasure ship, the Atocha.

39. The instant case arises from a marine salvage contract and, as with the situation in *Treasure Salvors*, there is little question that contract salvage cases also are encompassed by the admiralty jurisdiction conferred under 28 U.S.C. § 1333. Gilmore and Black, *The Law of Admiralty* (2d ed.) 578–585; see also Norris, 3A *Benedict on Admiralty* (7th ed.) Ch. 12, and cases discussed therein.

40. The more difficult question which might have been presented in this case is whether the subject matter jurisdiction granted in 28 U.S.C. § 1333 extends to *in rem* claims arising from events or occurrences within the territorial waters of a foreign sovereign.

41. It has long been clear that the federal courts' admiralty jurisdiction is not limited to causes of action which accrue within the territorial waters of the United States and embraces claims arising from events, including salvage operations, which occur on the high seas. *Treasure Salvors, supra*, 640 F.2d at 567.

42. The instant case, however, did not arise from a salvage operation on the high seas but immediately off the coast of Port Moin, Costa Rica, and squarely within the territorial waters of that foreign sovereign.

43. For whatever reason, however, Plaintiff Sea Lift has not asserted an *in rem* claim against the barge, but has sued only the vessel's owner, RECOPE, *in personam*. The question whether the Court's admiralty jurisdiction would extend to an *in rem* action against a salved vessel which is located within the territory of a foreign sovereign thus need not be reached.

■ 44. As will be discussed more fully below, the Court has clear jurisdiction over RECOPE as a party to this action. As the subject matter of the case is a claim arising from a marine salvage contract, it is clear

that federal jurisdiction was validly asserted pursuant to 28 U.S.C. § 1333.

### Applicable Law

45. While Plaintiff's comment at opening statement was therefore correct that both § 1332 and § 1333 provide independent bases for federal subject matter jurisdiction, it should be noted that the same rules of decision would be applied under either jurisdictional basis.

46. On first blush, it might appear that if the Court relied upon both diversity and admiralty as coexisting bases for jurisdiction, it would be confronted with a situation where two separate bodies of law simultaneously provide the governing rules of decision in the case.

47. Wearing its diversity hat, it would appear that the Court should apply Florida law under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

48. Wearing its admiralty hat, the Court would be bound to apply the ancient body of maritime law, and an entirely separate set of admiralty rules of procedure. Rule 9(h), Fed.R.Civ.P.

49. Since *Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 74 S.Ct. 202, 204, 98 L.Ed. 143 (1953), and *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959), however, it has been clear that where a case involves legal rights and liabilities which are cognizable in admiralty, the general admiralty law governs the case, no matter what forum is chosen. See also, *Branch v. Schumann*, 445 F.2d 175, 177–178 (5th Cir.1971).

50. It bears emphasis, then, that this is a marine salvage case and as stated above, at least since 1804 it has been assumed that marine salvage cases are quintessentially admiralty cases encompassed by the exclusive admiralty jurisdiction of the federal courts. *Mason v. The Blaireau*, 6 U.S. (2 Cranch) 240, 2 L.Ed. 266 (1804).

51. The Court finds, then, that even if the Plaintiff had never mentioned the issue of subject matter jurisdiction under 28 U.S.C. § 1333, and relied throughout on the diversity character of the litigation as the sole ground for federal jurisdiction, the Court would still have looked to the ancient corpus of maritime law and principles to find the governing rules of decision in the case.

52. Indeed, if this action had been brought in a Florida state court, reference to admiralty law would have been necessary to determine the rights and liabilities of the parties. *Kermarec, supra,* 79 S.Ct. at 408.

### In Personam Jurisdiction

53. In this Circuit the law is clear that in a diversity action, a federal court may exercise personal jurisdiction over a nonresident defendant only to the extent permitted by the long-arm statute of the forum state. *Oriental Imports and Exports, Inc. v. Maduro & Curiel's Bank*, 701 F.2d 889 (11th Cir.1983); *Rubaii v. Lakewood Pipe of Texas, Inc.*, 695 F.2d 541 (11th Cir.1983).

54. Since this is primarily an admiralty case wherein maritime law provides the rules of decision, however, Florida's long-arm statute is not immediately called into play. The considerations that determine federal *in personam* jurisdiction are essentially different in non-diversity cases. It is clear, however, that in non-diversity cases, the same fundamental principles of *in personam* jurisdiction govern whether the court is applying admiralty law, federal common law, or other laws of the United States. *H & F Barge Co. v. Garber Brothers, Inc.*, 65 F.R.D. 399, 407 (E.D.La.1974).

55. When considering the issue of *in personam* jurisdiction in admiralty cases, the starting point, of course, is with Rule 4, Fed.R.Civ.P., because "a court sitting in admiralty has personal jurisdiction over any defendant sued *in personam* whom the Court can reach with process." *Id.* at 404.

56. With respect to out of state inhabitants, the courts and commentators are in agreement that the provisions of Rule 4(e) are applicable to admiralty cases. *Id.* at 405 and cases cited therein.

57. Since Rule 4(e) allows service on out of state inhabitants in the manner prescribed by the forum state's long-arm statute, service under Rule 4(e) extends federal *in personam* jurisdiction much further than the provisions for effective service under Rule 4(f).

■ 58. Applying Rule 4(e) to the case *sub judice*, it is clear that the Court has jurisdiction over the parties under Florida's long-arm statute, § 48.193, Fla.Stat., which more than meets the minimum requirements for personal jurisdiction under the Due Process Clause, as set forth in *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *Worldwide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), and their progeny.

59. § 48.193(1)(g) provides that any person, whether or not a resident or citizen of the state of Florida, who personally or through an agent breaches a contract in Florida by failing to perform acts required by the contract to be performed in Florida, thereby submits himself to the jurisdiction of the courts of Florida for any cause of action arising from the "doing" of this act, i.e., breaching the contract in the State.

60. While Defendant RECOPE does not generally conduct business in Florida or maintain an office in the State, its agents came to Florida to actively solicit Plaintiff's services.

61. The salvage contract was signed by a RECOPE official in Costa Rica but was sent to Miami where it was executed by a Sea Lift official.

62. Although the contract does not provide for a specific place of payment, as the agreed currency for payment was United States dollars it is reasonable to infer that payment was to be made to Sea Lift at its headquarters in Miami, and not in Costa Rica.

63. Moreover, the Florida courts are almost in unanimous agreement that in the absence of an express designation of place of payment, the legal presumption that a debt is to be paid at the creditor's place of business is sufficient to satisfy the language of Florida's long-arm provision, § 48.193(1)(g). *Kane v. American Bank of Merritt Island,* 449 So.2d 974 (Fla. 5th DCA 1984); *Engineered Storage Systems Inc. v. National Partitions and Interiors, Inc.,* 415 So.2d 114 (Fla. 3d DCA 1982).

64. Plaintiff's claim has therefore fulfilled three important elements required by § 48.193(1)(g):

a. Sea Lift's claim satisfies the terms of § 48.193(1)(g), as Sea Lift alleges that RECOPE failed to "perform an act required to be performed" in Florida, i.e., payment of $265,000.00;

b. Sea Lift's claim fulfills the requirement of "connexity," as Sea Lift's cause of action arises from the "doing" of this act, i.e., failing to pay Sea Lift, in Florida, the amount of $265,000.00 on a contract which was solicited in Florida and which became binding in Florida; and

c. The assertion of personal jurisdiction over RECOPE under 48.193(1)(g) satisfies the requirements of the Due Process Clause, as the solicitation in Florida of Sea Lift by RECOPE's agents, and the presumption that RECOPE was to pay Sea Lift in Florida, are *prima facie* significant and substantial contacts with the State. In *International Shoe, supra,* the Supreme Court made clear that the starting point for the "minimum contacts" inquiry is whether the Defendant's acts in the State were deliberate and intentional, or merely fortuitous. In coming to Florida to solicit Sea Lift's services, in sending the contract to Florida to be signed and executed there, and in "failing to perform an act required by the contract to be performed in Florida," RECOPE was put on reasonable notice that it was subject to being sued in the State, *for a claim arising from these contacts with Florida.* In considering the issue of *in personam* jurisdiction under a

similar set of facts, the federal district court for the Middle District of Florida came to the same conclusion that § 48.-193(1)(g), as applied, meets the requirements of the Due Process Clause. *Thompson v. King,* 523 F.Supp. 180, 185 (M.D.Fla. 1981).

65. To summarize, then, in Admiralty cases the Plaintiff may, under Rule 4(e), effect service of process "upon a party not an inhabitant of or found within the state" in any manner prescribed by "a statute or rule of court of the state in which the district is held."

66. The manner in which Sea Lift met the terms of § 48.193, Fla.Stat. was discussed, *supra.*

67. Where service of process is authorized by Rule 4(e), i.e., by statute or rule of court in the forum state, Rule 4(i) prescribes alternative methods for effecting service in a foreign country.

68. As RECOPE did not renew its Motion to Quash after Plaintiff's third attempt to serve process upon it, the Defendant was obviously satisfied that there was finally compliance by the Plaintiff with Rule 4(i), and Defendant made a general appearance in the case by submitting its responsive pleading.

69. Sea Lift's third attempt to serve process on RECOPE thus conferred *in personam* jurisdiction over the Defendant.

### Venue

70. The renewed motion to dismiss which RECOPE submitted in January, 1984, several months after filing its responsive pleading, also raised an issue of improper venue on grounds of forum non conveniens.

71. RECOPE alleged that it should not have been required to undertake the expenditures of preparing for a trial and bringing witnesses to Miami, since the most convenient forum for this case would be the courts of Costa Rica.

72. In February, 1984, the Court denied RECOPE's Motion to Dismiss on grounds of forum non conveniens, citing as authority *C.A. La Seguridad v. Transytur Line,* 707 F.2d 1304 (11th Cir.1983).

73. *La Seguridad* holds that when an adequate, alternative forum is available, the Court must weigh the relative advantages and obstacles to a fair trial in each forum.

74. When the Defendant's renewed Motion to Dismiss was denied, this Court carefully considered all of the relevant factors, including Sea Lift's opportunity for a fair trial in Costa Rica against an entity which allegedly was owned by the Costa Rican government. The Court also considered ease of access to sources of proof, ability to obtain witnesses, and other practical problems that make trial of a case easy, expeditious and inexpensive. *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 842, 91 L.Ed.2d 1055 (1947).

75. With the clarity provided by hindsight, and upon further consideration of the factors set forth in *Gilbert, supra,* and *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981), the Court is satisfied that the Southern District of Florida was the proper and most convenient forum for the trial of this case.

### Sovereign Immunity

76. In its pretrial motions and in closing argument, Defendant RECOPE asserted that it is wholly owned by the government of Costa Rica. Until closing argument, however, RECOPE never raised sovereign immunity as an affirmative defense or in any responsive pleading.

77. In addition, RECOPE has never sought to show, through an evidentiary hearing or otherwise, that it is an "agent or instrumentality" of a foreign state, and thereby immune from the jurisdiction of this Court by virtue of the Foreign Sovereign Immunities Act (hereinafter "FSIA"), 28 U.S.C. § 1602, et seq.*

---

* Initially, Lloyds was named as a Defendant, and raised as its principal defense the issue of sover-

eign immunity. Lloyds, however, was voluntarily dismissed *before* RECOPE was effectively

78. Even if RECOPE had made such a showing, it is clear that it waived any defense of sovereign immunity it might have had when it submitted its responsive pleadings in September, 1983.

79. Although sovereign immunity is an issue of subject matter jurisdiction—Congress having divested the federal courts of jurisdiction over foreign sovereigns in certain cases under the FSIA—the fact that sovereign immunity may be waived clearly modifies the rule that lack of subject matter jurisdiction can be asserted at any time. Rule 12(h)(3), Fed.R.Civ.P.; *Canadian Overseas Ores Limited v. Compania de Acero Del Pacifico, S.A.*, 727 F.2d 274, 278 (2d Cir.1984).

80. A foreign sovereign waives its immunity when it fails to assert the defense in an answer or other responsive pleading. *Id.* at 278; see also, *Richardson v. Fajardo Sugar Company*, 241 U.S. 44, 36 S.Ct. 476, 60 L.Ed. 879 (1916).

81. In its several motions to dismiss which were filed before it submitted its responsive pleading, RECOPE did not mention, suggest, or imply that it intended to assert sovereign immunity as a defense. Instead, RECOPE relied solely on its claim of lack of *in personam* jurisdiction and improper venue as the legal bases for its motions to dismiss.

82. The vague allegation in its responsive pleading that "the Court does not have jurisdiction ... of the subject matter of the lawsuit" cannot be read as an assertion by RECOPE of the defense of sovereign immunity under the FSIA, especially in light of the issues addressed in its pretrial motions to dismiss. As stated above, RECOPE maintained throughout that the courts of Costa Rica did have jurisdiction over the parties and subject matter of the instant case.

83. The Court therefore concludes that even if RECOPE were an agent or instrumentality of the government of Costa Rica,

it waived the defense of sovereign immunity by failing to raise the issue before it made a general appearance in the case by submitting its responsive pleading.

## Liability Under the Contract: "No Cure—No Pay"

84. Having established that the Court properly exercised its *in personam* and subject matter jurisdiction, and that the Southern District of Florida was the proper venue for the case, the question whether Sea Lift fulfilled its obligations under the contract can now be addressed.

85. Although the Lloyds standard form agreement executed by the parties is recognized as the most widely used salvage contract worldwide, Gilmore & Black, *The Law of Admiralty* (2d ed.) 582, the particular contract at issue in this case is not abundantly clear and entirely without interpretive difficulties.

86. One such difficulty might have been the choice of law provision at paragraph 1(d) of the form: "This agreement shall be governed by and arbitration thereunder shall be in accordance with English law."

87. In fact, however, the choice of English law does not present any special difficulties because a choice of American law would have invoked an identical corpus of maritime principles.

88. In the absence of a federal statute which covers the field involved in a particular case, it has long been assumed that the substantive law to be applied in admiralty cases finds its origins in the ancient corpus of maritime law. Gilmore and Black, *The Law of Admiralty* (2d ed.) 45.

89. As the law of salvage is often said to be part of the *jus gentium*, American courts deciding marine salvage cases have generally taken "a relaxed attitude toward foreign law and choice of law problems, on the assumption that the law of the United States and the law of other maritime countries are the same." *Id.* at 533.

served with process and made its first appearance in the case. RECOPE never adopted Lloyds' sovereign immunity argument and, as

stated above, never asserted it in its own behalf until closing argument.

90. In the marine salvage area, American courts have been willing to be guided particularly by English precedents. *Id.* at 533, footnote 4.

91. For example, the leading American case on the subject of contract salvage, *The Elfrida*, 19 S.Ct. 146, 43 L.Ed. 413 (1898), draws heavily on English law and precedents.

92. As stated above in the Findings of Fact, the parties have modified the standard form agreement by adding two footnotes. One of these addenda does present an interpretive difficulty:

93. While paragraph 1(b) of the contract states that "the contractor's remuneration shall be fixed by arbitration in London," the parties have added a footnote which states that they had agreed to a fixed sum of $265,000.00 under the principle of "no cure—no pay."

94. Although the parties did not strike out the provision for arbitration to fix a sum, given the facts that (1) the Defendant concedes that were there "cure" the amount owing would be $265,000.00, and (2) the parties have not sought arbitration in London, it is reasonable to infer that the fixed sum agreed upon by the parties supercedes the arbitration procedure.

95. Such an interpretation of the contract is in line with maritime salvage custom and usage. Gilmore and Black, *The Law of Admiralty* (2d ed.) 583 ("The [Lloyds standard form] provides in elaborate detail for arbitration in London to determine the amount of the award *if no fixed sum has been written into the agreement.*"); see also Norris, 3A *Benedict on Admiralty* (7th ed.) § 159.

96. The principle to be applied where the parties have agreed upon a price for the salvage operation, enunciated by the Supreme Court in *The Elfrida, supra,* might be stated as follows:

97. It is not within the discretion of a court of admiralty to set aside salvage contracts in cases where, after the service is performed, the stipulated compensation may appear to be unreasonable.

98. Gilmore and Black explain that "under 'no cure—no pay' the salvor gambles on his ability to complete the job successfully, short of which he gets nothing." *The Law of Admiralty* (2d ed.) 582.

99. Thus as the Supreme Court explained in *Florida Dep't. of State v. Treasure Salvors, Inc.,* 458 U.S. 670, 102 S.Ct. 3304, 3329, 73 L.Ed.2d 1057 (1982) (citing *The Elfrida, supra*), "the inherent uncertainty in contracts for salvage have lead admiralty courts to find few reasons that would justify reformation of a contract."

100. The Court therefore concludes, as a matter of law, that it may not modify the $265,000.00 figure to take into account Sea Lift's actual costs, or the actual ultimate value of the salved barge, because, *when the contract was executed,* "the price agreed to be paid appeared to be just and reasonable, in view of the value of the property at stake, the danger from which it (was) to be rescued, the risk to the salvors and salving property, etc.," *The Elfrida, supra,* 19 S.Ct. at 150.

101. The final question to be decided, then, is whether there was "cure," i.e., whether the salvage operation was a "success" as intended by the parties.

102. Unfortunately, the long line of salvage contract cases provide little assistance in determining whether, as a matter of law, Sea Lift "cured" the booster barge by patching its hull, righting it, and leaving it on a jetty at Port Moin. As Gilmore and Black observe, "the widespread use of the Lloyds form, with disputes to be settled in the London arbitration, has naturally resulted in a considerable decrease in the volume of [contract] salvage litigation. To judge by the latest edition of [Kennedy's treatise on the law of civil salvage], salvage cases have virtually disappeared from the English reports in this century." *The Law of Admiralty* (2d ed.) 583.

103. *The Elfrida, supra,* is not helpful because in that case there was no dispute that the salvors lived up to their contractual obligations; the issue was whether the

salvage operation was worth the stipulated price.

104. In the non-contractual situation, a number of "traditional," and more recently "treasure salvors" cases have been reported. The "traditional" non-contractual salvage case typically involves a ship in danger on the high seas. The salvor is simply a volunteer who arrives on the scene to render aid. While on land he might be considered an "officious intermeddler" whom even equity will not aid, on the high seas the voluntary salvor is entitled to a reward, but only if three oft-stated elements are met. Gilmore and Black, *The Law of Admiralty* (2d ed.) 532.

105. First, there must be a marine peril from which the ship or property could not have escaped without the salvor's assistance. Second, the salvor's aid must have been voluntarily rendered, and not required as a pre-existing duty. And third, the salvor must have been successful, in whole or in part, of recovery of the imperilled ship or property. *Legnos v. M/V Olga Jacob*, 498 F.2d 666, 669 (5th Cir. 1974); see also Gilmore and Black, *The Law of Admiralty* (2d ed.) 534–535.

106. In the case *sub judice*, RECOPE contends that since the barge turned out to be worthless, and since it was left on a nearby jetty unable even to be scrapped, there was no "cure," and the salvage operation was not successful in whole or in part.

107. The evidence, however, leads the court to a different conclusion. Certain facts stand out when considering the issue of "cure" including, (1) the engine might have been taken from the barge before it capsized, (2) the barge was rusted and its hull riddled with gaps, holes and pores before the storm in June, 1980 which caused the boat to capsize, (3) the barge was clearly a marine peril after it flipped over and remained near the harbor floating freely, and (4) Sea Lift attempted to obtain permission to leave the barge at several locations other then on the jetty at Port Moin.

108. Moreover, the parties in using the term "cure" clearly did not intend refurbishing or restoration of the vessel, as a second contract was to be executed for those specific and distinct tasks.

109. The Court therefore concludes that in righting, refloating and transporting the barge ultimately to the jetty at Port Moin, Sea Lift satisfied and fulfilled the obligations which it undertook in executing the contract.

110. As emphasized above in the discussion of the law to be applied to this case, if this matter were before the Court on the basis of diversity of citizenship, 28 U.S.C. § 1332, the same conclusion would be reached. Under the rules of decision to be applied in both diversity and admiralty cases, Sea Lift is entitled to recover under the contract.

111. Thereupon, it is ORDERED AND ADJUDGED that a final judgment shall be entered in favor of Plaintiff Sea Lift and against Defendant RECOPE in the amount TWO HUNDRED SIXTY FIVE THOUSAND DOLLARS ($265,000.00).